IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FILED

MAR = 7 2012

USDC WP SDNY

---------------------------------------------------------x

CONCORD ASSOCIATES, L.P.,                     :
CONCORD RACEWAY CORPORATION,                  :
CONCORD KIAMESHA CASINO LLC,                  :
CONCORD KIAMESHA CAPITAL CORP.,               :
CONCORD RESORT, LLC,                          :
CONCORD KIAMESHA, LLC, and                    :
CONCORD KIAMESHA HOTEL , LLC                  :

Civ. No. _____

12 CV 1667

                                              :
                            Plaintiffs,       :     **JURY TRIAL DEMANDED**
                                              :
                                              :
              v.                              :
                                              :
                                              :
ENTERTAINMENT PROPERTIES TRUST,               :     *JUDGE RAMOS*
EPT CONCORD, LLC, EPT CONCORD                 :
II, LLC, EMPIRE RESORTS, INC., and            :
MONTICELLO RACEWAY MANAGEMENT,                :
INC.,                                         :
                            Defendants.       :
---------------------------------------------------------x

## COMPLAINT

Plaintiffs Concord Associates, L.P. ("Associates"), Concord Raceway Corporation ("Raceway Corp."), Concord Kiamesha Casino LLC ("Casino"), Concord Kiamesha Capital Corp. ("Capital"), Concord Resort, LLC ("Resort LLC"), Concord Kiamesha, LLC ("Kiamesha") and Concord Kiamesha Hotel, LLC ("Kiamesha Hotel") (collectively, "Plaintiffs") hereby sue Defendants Entertainment Properties Trust ("EPT"), EPT Concord, LLC ("EPT Concord"), EPT Concord II, LLC ("EPT Concord II") (collectively, "Entertainment Properties" or the "EPT Defendants"), and Defendants Empire Resorts, Inc. ("Empire") and Monticello Raceway Management, Inc. ("Monticello") (Empire and Monticello are referred to collectively as "Empire," and are referred to collectively with the EPT Defendants as "Defendants") pursuant to the antitrust laws of the United States. Upon knowledge as to their own actions and matters of

public record, and otherwise upon information and belief and investigation by themselves and by their attorneys, Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.      In 2001, New York enacted legislation authorizing operation of video lottery terminals ("VLTs") at harness and thoroughbred tracks throughout the State. In 2009, New York State Lottery authorized the tracks to add electronic table games ("ETGs"). VLTs are gaming machines, similar in appearance to casino slot machines. ETGs simulate table games like roulette. All VLTs and ETGs (collectively "VGMs") are connected to a centralized computer system that allows New York State to monitor game play and collect its share of the revenue therefrom.

2.      Since 2004, two New York thoroughbred tracks (Finger Lakes and Aqueduct) and all seven of New York's harness racing tracks have opened "racinos" offering racing and parimutuel wagering on such races, and VGM gaming.

3.      According to a January 2012 report commissioned by the New York Gaming Association, an organization that represents New York's nine racinos, New York racinos currently account annually for more than $25 billion in VGM play, more than $1.7 billion in net win shared between the State and racino operators, and more than $830 million in racinos' contributions to education funding in New York. Approximately 10% of the "win is used to support New York's racing and breeding industries. In addition, the nine New York racinos employ approximately 17,400 people.

4.      Defendant Empire's subsidiary, Defendant Monticello, operates the Monticello Casino and Raceway ("Monticello Casino"), a harness track racino located in the Village of Monticello, Sullivan County, New York. Monticello Casino has a 45,000 square foot VGM

facility with more than 1,100 VGMs. Monticello's harness track, opened in 1958, offers pari-mutuel wagering on races at the track and on thoroughbred and harness races conducted outside of New York that can be viewed at Monticello via simulcasts.

5.  For the nine months ended September 30, 2011, Empire reported net revenues and operating income from Monticello Casino of $53,537,000 and $1,955,000, respectively.

6.  Monticello Casino is the only race track and legal gaming facility in Sullivan County or elsewhere in the Catskill Region (as defined below). The nearest racino to Monticello Casino is more than 80 miles away.

7.  Empire and the EPT Defendants have combined and conspired to take actions which were and are intended to prevent, and which have prevented, Plaintiffs from establishing a competing racino at the site of the former Concord Hotel and resort in the Town of Thompson in Sullivan County, approximately four miles from the Monticello Casino (the "Concord Property" or "Concord Site").

8.  Plaintiffs are Empire's only potentially viable competitor in the Catskill Region, and the Concord Property is the only viable location for Plaintiffs to build a racino that could compete effectively with the Monticello Casino.

9.  Defendant Entertainment Properties owns certain parcels of the property at the Concord Site, subject to certain rights of Plaintiffs as hereafter alleged, the use of which is essential to the realization of Plaintiffs' plans to establish a competing racino.

10.  To foreclose Plaintiffs' access to such property, Empire has induced Entertainment Properties to repudiate agreements with Plaintiffs and deny Plaintiffs the use of these essential facilities.

11.     Defendants have effected their scheme by anticompetitive and monopolistic practices, including, among other things, (a) agreeing that Entertainment Properties will (i) repudiate its obligation to give Plaintiffs access to property at the Concord Site that is essential for the Plaintiffs' construction of the proposed racino and (ii) disavow a restrictive covenant and other contractual rights that give Plaintiffs the exclusive right to build a harness track and racino on the Racino Tract (as defined below); (b) sabotaging Plaintiffs' then-imminent $395 million bond offering in October 2011 and a related $50 million loan to Plaintiff Kiamesha Hotel for construction of the new Concord Hotel; and (c) collusive prosecution of a sham Article 78 proceeding against the Town of Thompson, and against Plaintiff Associates.

12.     By this action, Plaintiffs seek treble damages in an amount not less than $1.5 billion and permanent injunctive relief to end Defendants' conspiratorial, anticompetitive, and monopolistic practices and to permit Plaintiffs to proceed with the development of a racino at the Concord Property to compete with Empire's Monticello racino.

## JURISDICTION AND VENUE

13.     The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a).  Plaintiffs' claims arise under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Section 16 of the Clayton Act, 15 U.S.C. § 26, Section 4 of the Clayton Act, 15 U.S.C. § 15, and seek declaratory relief under 28 U.S.C. §§ 2201 and 2202.

14.     The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, all of which are so related to the claims in the action within the Court's federal question jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

15.     Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. §1391. All or a substantial part of the property at issue in this action is situated within this District, Defendant Empire has its principal place of business within this District, and a substantial part of the events or omissions giving rise to the claims in this action occurred in this District.

## THE PARTIES

16.     Plaintiff Associates is a New York limited partnership duly organized and existing under the laws of the State of New York with its principal place of business at 115 Stevens Avenue, Valhalla, New York 10595.

17.     Plaintiffs Raceway Corp. and Capital are corporations duly organized and existing under the laws of the State of New York, are authorized to do business in the State of New York, with their principal place of business at 115 Stevens Avenue, Valhalla, New York 10595.

18.     Plaintiffs Casino, Resort LLC, Kiamesha and Kiamesha Hotel are Delaware limited liability companies duly organized and existing under the laws of the State of Delaware, are authorized to do business in the State of New York, with their principal place of business at 115 Stevens Avenue, Valhalla, New York 10595.

19.     Defendant EPT is a Maryland real estate investment trust having its principal place of business located at 30 West Pershing, Suite 201, Kansas City, Missouri 64108.

20.     Defendants EPT Concord and EPT Concord II are limited liability companies organized and existing under the laws of the State of Delaware, are authorized to do business in the State of New York, and have their principal place of business at 30 West Pershing, Suite 201, Kansas City, Missouri 64108.

21.     Defendants Empire and Monticello are corporations controlled by a Malaysian gambling conglomerate, organized and existing under the laws of the State of Delaware, with a principal place of business located at 204 Route 17B, Monticello, New York 12701.

## RELEVANT MARKET

22.     The relevant product markets in which the restraints and other anticompetitive conduct of Defendants have had, and will continue to have, significant anticompetitive effects and cause antitrust injury are the markets for gaming and racing in the Catskill Region (the "Catskill Region Racing/Gaming market") and related markets for lodging, entertainment and resort tourism products and services in the Catskill Region (the "Catskill Region Resort Tourism market").

23.     There are significantly high barriers to entry to these markets, principally attributable to (a) New York law limiting issuance of a racino license to the operator of a licensed harness racing track; (b) the availability of only one remaining government license to operate a new harness race track in New York, which had been earmarked for issuance to Plaintiff Raceway Corp. to establish and operate a harness race track at the Concord Site; and (c), the uniqueness to consumers of the Catskill Region as a tourism destination, and the well-known Concord Site specifically, as a site for racino and resort.

24.     The relevant geographic market for the purposes of this lawsuit is the tourism destination area known as the "Catskill Region," encompassing Sullivan County, New York and extending into Delaware, Greene and Ulster Counties (the "Geographic Market").

25.     The Catskill Region has a long and storied history as a tourism and vacation destination, with popular natural resources for water sports, mountain sports, hunting and golf.

The Catskill Region is celebrated in books, art, music and popular movies which concern and confirm the region's widespread reputation for tourism.

26.     While tourism had long been the backbone of the Catskill Region economy, for most of the past 25 years, this Geographic Market has endured a severe economic recession accompanied by extremely high levels of unemployment and poverty.  Since the 1990s, a key element of efforts by New York State and Catskill Region authorities to revive Catskill Region tourism has been the proposed development and expansion of legal gaming in Sullivan County as the centerpiece of new commercial development to attract new tourism and provide employment in the region.

27.     Plaintiffs' redevelopment of the Concord Site as a site for a racino and resort has been the centerpiece of those efforts.

28.     Defendants Empire, through its subsidiary Monticello, operates the Monticello Casino, the only harness track and only racino in the Catskill Region.  Its monopoly relieves it of the need to compete with anyone else in the Catskill Region for consumers and suppliers of racing and gaming products and services, without the pressures supplied by local competition to improve the quality or prices of the products and services it offers.

29.     Having two separately owned racinos instead of one racino in the Catskill Region will cause growth and promote competition in the Catskill Region Racing/Gaming market. Consumers and horsemen would have greater choice and more bargaining power for a variety of products and services including (without limitation) transportation, lodging, parking, food, gaming play incentives, paddock facilities, barn rents, and race prize money, as the two racinos would compete with each other for consumers and horsemen.

30.     Further procompetitive effects in the Catskill Region Resort Tourism market would naturally flow from Plaintiffs' establishment of a racino at the Concord Site to compete with Monticello Casino.  Plaintiffs' racino at the Concord Site is the most essential element of a master development plan for new resort and entertainment facilities to be built by Plaintiffs and others at the Concord Site and would lead to an influx of new tourism and competing development of hotels, restaurants, retail shopping centers and entertainment sites (such as water parks and golf courses), throughout the Catskill Region, giving visitors greater choices of price and quality.

31.     However, the Malaysia-based controlling owner of Empire and Monticello has no interest in the growth of the Catskill Region racing or gaming markets if that would mean it would need to compete for its share of that market, preferring its monopoly over racing and gaming in a limited Catskill Region economy to a duopoly share of a larger Catskill Region racing and gaming market where it would face competition for consumers and horsemen, notwithstanding the opportunity for greater profits therefrom.

32.     Since the Malaysian owners acquired control of Empire and Monticello in 2010, they have fought all efforts to open their Catskill Region monopoly to competition, and have induced the Kansas City-based owners of the property essential for location of a competing racino, Entertainment Properties, to be their partner in stifling Plaintiffs' efforts to introduce competition into the Catskill Region Racing/Gaming market.

## FACTS

### Background – Redeveloping the Concord Property

33.     The Concord Property, comprising approximately 1,600 acres adjacent to Kiamesha Lake, was the site of the Concord Resort Hotel, a world-famous vacation destination

for visitors to the Catskill Region for half a century, until its closing in 1998.  The Concord featured over 1,500 guest rooms, a dining room that seated 3,000 where top live entertainment took place, and two championship golf courses, including the renowned "Monster" course.

34.     The former owners of the Concord Resort Hotel, believing that the development of legal gaming in the Catskill Region could revive it as a competitive economic tourism destination as had occurred recently in nearby states, lobbied New York State for a voter referendum to permit legalized gaming in the region.

35.     In 1997, after the New York State Legislature failed to pass a bill authorizing such a referendum, the Concord Resort Hotel went into bankruptcy, owing Sullivan County more than $8 million of property taxes.

36.     In 1999, Associates, headed by Louis R. Cappelli, bought the Concord Property from the bankruptcy estate.  Associates transferred a portion of the property to its affiliate Resort LLC in 2008.  Resort LLC transferred that portion of the property to Defendant EPT Concord II in June 2010.

37.     Louis R. Cappelli, is a New York–based real estate developer who has designed and developed more than twenty million square feet of mixed use, retail, residential, office, medical and parking facilities throughout the Northeast United States.

38.     Cappelli's real estate development projects have revived the previously depressed downtown districts of New Rochelle and White Plains with large scale mixed-use developments, including White Plains City Center, Trump Tower White Plains, Trump Plaza New Rochelle, The Ritz-Carlton Hotel in White Plains, The Residences at The Ritz-Carlton, Westchester, The Lofts at New Roc and New Roc City in New Rochelle.

39.    Since buying the Concord Site out of bankruptcy in 1999, Cappelli, through Associates and related companies under his management, has invested more than $100 million toward development of a high end tourism resort destination, offering a luxury hotel, name entertainment, championship golf and—most importantly—legal gaming at the Concord Site, which would revitalize Sullivan County and the Catskill Region as a tourism destination.

40.    New York's nine existing racinos are stand-alone race tracks unaffiliated with and unconnected to resort tourism facilities such as luxury hotels or golf courses, or even other nearby racinos.

41.    Plaintiffs' proposed racino at the Concord Property would be New York's first racino connected to a high end tourism resort, where visitors could come to play, stay and engage in a multitude of tourism-related activities, and not just gamble and go home.

**Associates Obtains Approvals to Construct its**
**Casino/Hotel Project at the Concord Property**

42.    From 1999 until June 18, 2010, Plaintiffs Associates and Resort LLC, an affiliate of Associates, owned all 1,600-plus acres comprising the Concord Site, including (a) the approximately 1,500 acres housing the two golf courses, some residential properties and vacant land (the "Resort Property"); and (b) the approximately 140 acres identified on the tax assessment map of the Town of Thompson, County of Sullivan as Section 9, Block 1, Lots 34.1, 34.2, 34.4, 34.5, 34.6 and 34.7, where the Concord Hotel used to be (the "Casino Property").

43.    In 2000, Associates began the approvals process to permit the redevelopment of the Concord Site with a new mixed use redevelopment project including, without limitation, new resort facilities, commercial uses, residential uses, restoration of the Monster golf course and other related amenities and infrastructure.

44.     On or around November 21, 2006, and after an exhaustive review under the New York State Environmental Quality Review Act ("SEQRA") and other applicable State and local laws, rules and regulations, Associates obtained all necessary administrative approvals from the Town Board of the Town of Thompson (the "Town Board") and the Planning Board of the Town of Thompson (the "Planning Board") to permit the redevelopment of the Concord Site.

45.     In or around March of 2008, Associates submitted an application to the Town Board and the Planning Board to permit the development of a hotel and gaming facility (the "Concord Casino"), a harness horse racetrack (the "Racetrack"), and other related improvements on the Casino Property and a portion of the Resort Property (hereinafter, the "Casino/Hotel Project").

46.     In or around April of 2008, Associates received all necessary approvals from the Town Board and Planning Board to permit the construction of the proposed Casino/Hotel Project.

47.     In or around September of 2008, the Building Inspector for the Town of Thompson issued building permits permitting Associates to construct its approved racetrack paddock and maintenance building, the grandstand for the Racetrack and for the Concord Casino, parking structure and hotel (the "Building Permits").

48.     Thereafter, Associates performed substantial work at the project site in reliance upon the Building Permits, including, without limitation, pre-construction work, site work, substantial environmental remediation work, and foundation work for the Casino/Hotel Project.

49.     Associates has spent in excess of $100 million to date on the approvals and development of the Concord Site, including demolition, site work and partial construction.

**Associates Obtains Comfort Letters from New York State Regarding Issuance
of a Racino License and Statutory Benefits From the State for the Proposed Racino**

50.     On January 15, 2009 and February 23, 2009, affiliates of Plaintiffs received from

the New York State Department of Racing and Wagering ("NYS Racing") and from the Division

of Lottery (the "Lottery Commission") preliminary approvals for a racino license for the Casino/

Hotel Project, a license that would permit racing/wagering and a casino/hotel at the Concord

Site. These approvals were in the form of comfort letters (the "Comfort Letters"), that indicated

that licensing would be granted to Plaintiffs upon completion of a project in accordance with its

approved plans and upon compliance with other conditions.  New Comfort Letters confirming

this were issued by NYS Racing and the Lottery Commission to Raceway Corp. on May 25,

2011 and September 16, 2011.

51.     In August 2009, the State of New York adopted legislation to permit the one new

racino to be located at the site of the former Concord Resort to retain a far greater percentage of

its VGM revenues than the rates applicable generally to other New York racinos, as an incentive

for new investment in and creation of employment at the Concord Property.  This legislation

made the Concord Site a unique facility for development of a racino and was and is an incentive

to Plaintiffs to build the Casino/Hotel Project there and thereby create directly more than 1,500

permanent new jobs.  *See* N.Y. Tax Law § 1612b(1)(G).

**The Transfer of the Resort Property to EPT Concord II**

52.     Defendant EPT Concord II acquired title to the Resort Property from Plaintiff

Resort LLC on or about June 18, 2010.  This was part of a global settlement intended to resolve

several competing lawsuits between Entertainment Properties and Associates, and affiliates of

Plaintiffs and Louis R. Cappelli, which were pending in the United States District Court for the

Western District of Missouri and in the Supreme Court of the State of New York.

53.     Pursuant to the terms of the settlements, Plaintiff Associates retained the Casino Property, and Plaintiff Resort LLC transferred to Defendant EPT Concord II the Resort Property—approximately 1,500 acres of the Concord Property adjacent thereto, subject to certain rights in that land that were reserved for Plaintiffs' exclusive use and exploitation

54.     As part of the consideration for the transfer of the Resort Property, Defendant EPT Concord II entered into a June 18, 2010 Casino Development Agreement (the "CDA") with Plaintiffs Associates, Resort LLC and Kiamesha,

55.     In the CDA, Defendant EPT Concord II agreed to provide Plaintiffs with, *inter alia*, certain easements, leases and other agreements regarding the use and development of a hotel, a racing and gaming facility and other improvements on the Resort Property.

56.     The settlement specifically reserved for Plaintiffs a right to lease a portion of the Resort Property on a tract adjacent to the Casino Property, upon which Plaintiff Kiamesha would construct, develop and operate a licensed 5/8th mile oval harness racetrack and parimutuel wagering complex containing approximately 33,000 square feet of indoor and outdoor seating, a 45,000 square foot padlock area, a 13,000 square foot maintenance barn and related ancillary surface parking (the "Racino Tract").

57.     Pursuant to the CDA, Plaintiff Kiamesha would become the fee owner of the Racino Tract following completion of construction of the racino and receive all revenues from the facility.

58.     As another part of the June 18, 2010 global settlement (of which the CDA was one component), Defendant EPT Concord II, as grantor, executed and delivered a restrictive covenant to Plaintiff Resort LLC, whereby EPT Concord II agreed that, for the period set forth in the Restrictive Covenant, neither it nor its successors or assigns will own or operate any casino,

racino, racing or gaming facility or any other games of chance on the Resort Property other than by Plaintiffs (the "Restrictive Covenant").

59.     The Restrictive Covenant was recorded against the Resort Property on July 15, 2010 as Instrument No. 2010-56691.

60.     Defendants have known at all relevant times of Plaintiffs' intentions, efforts and expenditures to acquire the one available license to build a harness track and to operate a racino on the Racino Tract as the centerpiece of the Plaintiffs' plans for the Casino/Hotel Project at the Concord Property.

**Associates Partners with Mohegan Sun**

61.     On or about April 7, 2011, Associates entered into a term sheet with Mohegan Gaming New York, LLC ("Mohegan"), an affiliate of the Mohegan Tribal Gaming Authority, one of the United States' leading gaming hospitality operators, to jointly develop and operate the Concord racino, to be known as "Mohegan Sun at the Concord."

62.     Mohegan Sun at the Concord would consist of an 800,000 square foot full service facility including:

(a)     Approximately 63,000 square feet of gaming space with approximately 2,500 VGMs, a high-end VIP gaming area and simulcast facility for parimutuel horse race wagering;

(b)     A 252 room hotel tower connected directly to the gaming floor, containing 21 suites and featuring 24 hour room service and a fitness center;

(c)     Live racing on a 5/8 mile harness race track, including an approximately 33,000 square foot two-level complex with indoor and outdoor seating, private luxury boxes and simulcast parimutuel wagering;

(d)   Nine diverse dining options, including a signature steak house with at least 130 seats, a casual branded restaurant with at least 130 seats, an approximately 500 seat full-service buffet, an approximately 180 seat 24 hour café and five branded quick-service venues in a food court setting;

(e)   Approximately 30,000 square feet of state-of-the-art meeting and event space;

(f)   An approximately 250 seat entertainment lounge and a centrally located bar and lounge on the gaming floor;

(g)   Championship golf, including a new club house through the Entertainment Properties golf course lease provided for in the CDA; and

(h)   Approximately 2,750 parking spaces, including over 300 underground valet spaces.

63.   An experienced group of professionals with a strong track record of completed casino, racetrack and hospitality projects was assembled by Associates to develop and construct the Mohegan Sun at the Concord.

64.   The planning and design of the Casino/Hotel Project was managed by Marnell Architecture, an affiliate of Marnell Companies, a world renowned architecture, design and development firm with decades of experience in some of the most complex, high profile projects in the gaming and lodging industry, including Wynn Resort, the Mirage and MGM in Las Vegas.

65.   Construction, zoning, and other real estate permits and approvals necessary to construct the Casino/Hotel Project, based on 60% complete construction design, were obtained.

66.   Mohegan Sun at the Concord was scheduled to open in the summer of 2013.

**Defendants' Anticompetitive Conspiracy**

67.     Until approximately 2009, Defendant Empire cooperated with Plaintiffs' efforts to develop a racino at the Concord Property in the Catskill Region.

68.     In a March 23, 2009 agreement between Associates and Empire, whereby Empire agreed to provide management services to Plaintiff Raceway Corp. at the new harness track, Plaintiffs were planning to build at the Concord Site, Empire acknowledged that the issuance of the eighth and final harness track license to Raceway Corp., a prerequisite the completion of the Casino/Hotel Project, would revitalize and invigorate the economy and tourism industry in Sullivan County.

69.     However, in 2009, a Malaysian gaming corporation, Kien Huat Realty III Limited, acquired majority ownership of Empire("Kien Huat").,.

70.     Kien Huat owns indirectly approximately 40% of and controls Genting Group, a Malaysian family of public companies with a market capitalization of more than $40 billion that is the largest private operator of gaming facilities in the world.

71.     Shortly after acquiring majority ownership of Empire, Genting acquired the rights to operate a racino at Aqueduct Race Track in New York City, an opportunity Cappelli had introduced to  Empire, which is how Genting was able to acquire the opportunity for itself.

72.     Since acquiring Aqueduct, Genting has lobbied against New York providing gaming licenses anywhere near Aqueduct, arguing that it must be permitted to operate with a geographic gaming monopoly.

73.     Similarly, shortly after Kien Huat acquired majority control of Empire, Empire stopped cooperating with Plaintiffs, and engaged in various illegally anticompetitive efforts to undermine the efforts of Plaintiffs (Empire's only viable competitor in the Catskill Region

Racing/Gaming market) to complete development of the Concord Casino/Hotel Project, culminating in Empire's inducement of Entertainment Properties to stop cooperating with Plaintiffs in contravention of Entertainment Properties agreements with Plaintiffs.

74.     In the months following the June 18, 2010 CDA, Defendant Entertainment Properties initially indicated to Plaintiffs and to the public a desire and willingness to cooperate and facilitate Plaintiffs' development of Plaintiffs' Casino/Hotel Project, while at the same time pursuing development of its own complementary theme park, housing and golf course and retail properties on their Resort Property.

75.     However, Entertainment Properties' conduct changed sometime in 2010 or early 2011, coinciding with a secret conspiracy that it entered into with Empire after Kien Huat acquired control of Empire.

76.     Unbeknownst to Plaintiffs, Entertainment Properties agreed with Empire to develop a new Empire-operated racino on a portion of the Resort Property.

77.     Towards that end, Entertainment Properties and Empire conspired to interfere with Plaintiffs' ability to complete the Casino/Hotel Project, to preserve and perpetuate Empire's monopoly over the Catskill Region Racing/Gaming market.

78.     In furtherance of their conspiracy, on April 12, 2011, Entertainment Properties and Empire announced an agreement (the "Exclusivity Agreement") to "explore the joint development of the companies' respective properties located in Sullivan County." The announcement falsely stated that "Entertainment Properties Trust owns the former Concord Hotel property, 1,700 acres at the site of the former hotel in Kiamesha Lake."

79.     In a June 16, 2011 letter, Empire's counsel admitted that Empire will "take all necessary and appropriate steps" to prevent Plaintiff Raceway Corp. from obtaining the eighth and final available harness racing license, a prerequisite to building the Casino/Hotel Project.

80.     On or about June 24, 2011, Entertainment Properties and Empire announced that they had reached a master development agreement term sheet "to develop a comprehensive, integrated destination resort on the site of the former Concord resort" including a racino.

81.     On August 4, 2011, Entertainment Properties and Empire announced that they had selected a master planner who would create a new master plan for the development of the Resort Property which would be anchored by a racino and have a harness racetrack, hotel, two golf courses, specialty lodging and complementary retail in contradiction to the Restrictive Covenant.

82.     Defendants' press releases intentionally omitted any mention of Plaintiffs' conflicting development rights with respect to the Racino Tract, or the Restrictive Covenant in Plaintiffs' favor with respect to the Resort Property, and implied that Plaintiffs' Casino/Hotel Project had been abandoned.

83.     The Exclusivity Agreement, the master development term sheet and the press releases jointly issued by Entertainment Properties and Empire were acts in furtherance of Defendants' conspiracy to deny and usurp Plaintiffs' rights and opportunities to build a racino that would compete with Monticello Casino, and to kill or diminish Plaintiffs' Casino/Hotel Project and thereby foreclose effective competition from Plaintiffs for Defendants' joint efforts to dominate related markets for lodging, entertainment and resort tourism.

84.     Since announcing the Exclusivity Agreement, the EPT Defendants have disavowed their obligations to Plaintiffs under the Restrictive Covenant and the terms of the

CDA, including Defendant EPT Concord II's obligation to lease the Racino Tract to Associates for the Casino/Hotel Project.

85.     Since the time it was first announced, the Exclusivity Agreement has been extended by Entertainment Properties and Empire on multiple occasions.

86.     EPT Concord II is obligated to deliver to Associates a ground lease for the Racino Tract upon satisfaction of financing conditions.

87.     The net proceeds of the $395 million bond financing and $50 million loan would have satisfied the financing conditions.

88.     Entertainment Properties, after reviewing and editing the planned bond documents, in apparent furtherance of the Plaintiffs' bond financing, without explanation refused to issue the ground lease at the last minute before the scheduled financing "road show." This action derailed the financing and is now the subject of state court litigation.

89.     The CDA further provides that, even if the financing condition were not satisfied, EPT Concord II is still obligated to deliver the signed ground lease to Associates on June 17, 2012, upon payment of annual rent in the amount of $200,000.

90.     However, at Empire's urging, Concord II has repudiated its agreement to provide Associates the ground lease, making extra-contractual demands on Plaintiff Associates to deliver certain agreements and concessions to which EPT Concord II is otherwise not entitled, including, but not limited to, a release of the Restrictive Covenant, assignment of certain master development rights held by Associates and a commitment that Associates will cooperate with EPT Concord II in connection with any request for rezoning or variances, requests to amend, resubmit or modify the Comprehensive Development Plan for the Casino/Hotel Project. This was done to enable Defendants to impede Plaintiffs' Casino/Hotel Project and instead permit

Empire and Entertainment Properties to proceed with their development of an Empire racino resort on the Resort Property.

91.     On or about December 22, 2011, Empire and Entertainment Properties publically announced that they had entered into an Option Agreement, whereby Empire agreed to pay EPT Defendants $750,000 for an option to lease a portion of the Resort Property to pursue Empire's own racino project.

92.     Defendants' joint media campaign has had the intended and anti-competitive effects of maligning and disparaging Plaintiffs' efforts to develop the Casino/Hotel Project and chilling debt financing for Plaintiffs' Casino/Hotel Project, in furtherance of Defendants' conspiracy to prevent competition from Plaintiffs' Casino/Hotel Project.

93.     Defendants' proposed racino project at the Concord Resort property would violate the Restrictive Covenant, effectively preclude Plaintiffs' Casino/Hotel Project and cement Empire's monopoly over the Catskill Region Racing/Gaming market.

94.     Empire has also attempted to impede completion of the Casino/Hotel Project by informing both Plaintiffs and the Town Board that owners of any horses racing at the proposed harness racing track at the Concord Site would not be permitted to board their horses at the overnight paddocks at Monticello Raceway, utilize Monticello Raceway's Barn and Training facilities, or race at Monticello Raceway.  These exclusions were made with the intent of making the Casino/Hotel Project appear economically and environmentally unviable and as a threat to the horsemen who depend upon the barns at Monticello Raceway to board their horses to refuse to deal with the proposed Concord racetrack.

95.     Defendants' combination, conspiracy and agreements, including the Exclusivity Agreements and the Option Agreement, operate as an unreasonable restraint on competition, and

have had and will have an adverse effect on competition, by stifling the development of the

Casino/Hotel Project and maintaining Empire's monopoly over the Catskill Region

Racing/Gaming market.

96.     Defendants' foregoing actions have effectively sabotaged Plaintiffs' Casino/Hotel

Project financing efforts, including the $395 million bond offering and $50 million loan, by

repudiating Plaintiffs' leasehold and development rights with respect to the Resort Property, thus

deterring placement agents and lenders from proceeding.

**The Sham Article 78 Proceeding**

97.     In furtherance of its attempt to illegally maintain its monopoly over the Catskill

Region Racing/Gaming market, on or about October 4, 2011, Empire filed an Article 78

proceeding in New York State Supreme Court, Sullivan County, challenging the Town Board's

extension of two building permits (the "Building Permits") previously issued to Plaintiff

Associates by the Building Inspector of the Town of Thompson.  The challenged extension was

not the first, or even the second, but the third extension granted by the Town Board.

98.     The Article 78 proceeding was brought against the Town of Thompson,

Associates, and—collusively—"against" EPT Concord II.  EPT Concord II did not oppose the

action, but in fact was excused from answering the Petition by its co-conspirator, further

evidence of the conspiracy between Defendants.

99.     Empire, in its sham Article 78 proceeding, asserted unfounded claims that the

Building Permits extensions were done in violation of SEQRA and local law.

100.    The claims asserted by Empire in its Article 78 proceeding were not objectively

reasonable, as the renewal and/or extension of a building permit is not subject to a "hard look"

review under SEQRA, and because the Building Permits were duly extended in accordance with

the applicable laws, rules and/or regulations, which undeniably authorized the Town Board to grant an extension of the Building Permits.

101.    Further, other than a threat to its illegal monopoly, Empire had not suffered an injury of any kind stemming from the Town's extending the Building Permits, and thus lacked standing to bring the action.  Accordingly, the proceeding was dismissed on February 22, 2012 on the grounds of lack of standing and lack of merit.

102.    The Article 78 proceeding was a frivolous lawsuit, initiated solely with the intent of stifling competition, specifically aimed at harming Plaintiffs' Casino/Hotel Project through the abuse of process, and not with any belief in the legal merits of such action.

## INTERSTATE TRADE AND COMMERCE

103.    Defendants' unlawful activities as described herein occurred in, and have directly, substantially, and foreseeably affected and continue to affect, interstate commerce.

104.    While the principal economic effects of the Defendants' illegal anticompetitive scheme are felt and will be felt in Sullivan County, New York and the neighboring counties that comprise the Catskill Region, Monticello Casino serves tourists and harness racing professionals from various states, as would Plaintiffs' planned Concord racino and resort.  A January 2012 study commissioned by the New York Gaming Association estimated that by the end of 2011, "out-of-state visitor spending" at New York's racinos exceeded $93 million annually.

105.    It was the intention of the parties to promote their business to customers through mail and the internet.  Plaintiffs' $395 million underwritten bond offering and $50 million loan that Defendants' illegal conspiracy scuttled were in the process of being marketed to investors throughout the United States through the instrumentalities of interstate commerce.  Defendants'

acts to sabotage those financings occurred through the use of facilities of interstate commerce, including publication of press releases through wire services and the internet.

106.    Horsemen from out of state race and train at Monticello Raceway and would race and train at the Concord harness track to be built at the Resort Property.

107.    Races at Monticello Raceway are simulcast through facilities of interstate commerce so that the races may be viewed outside New York and legal parimutuel wagering occurs outside New York on the outcome of such races.  Similar simulcasting of Concord harness track racing is expected to occur.

## INJURY TO CONSUMER WELFARE AND COMPETITION

108.    Defendants' anticompetitive scheme has had and continues to have the direct, intended and reasonably foreseeable effect of reducing competition in the markets in the Catskill Region for gaming and racing products and services and related lodging, entertainment and resort tourism products and services.  Defendants' anticompetitive scheme reduces consumer and public welfare in that:

(a) actual and potential competition in the market for racing (including parimutuel wagering), gaming and related tourism amenities in the Catskill Region has been, and will continue to be, limited, reduced, restrained, suppressed, and substantially foreclosed;

(b) instead of free, open, and competitive markets for racing and gaming, Empire's monopoly position has been  maintained and insulated against viable competition;

(c) Plaintiffs have been and will be effectively foreclosed from competing with Empire or the Empire/Entertainment Properties joint venture in any meaningful way, reducing options for consumers of racing, gaming and related tourism products and services in the Catskill Region, and preventing the expansion of employment at the racino, racetrack, hotel, restaurants and other amenities that would be developed around the "anchor" of Plaintiffs' proposed racino at the Concord Site;

(d) as a result, consumers of such products and services pay and will continue to pay supra-competitive prices;

(e) others such as track, casino and hotel workers and vendors, and horse racing professionals will be detrimentally impacted by the lack of competition to Empire's monopoly and Empire/Entertainment Properties' monopolistic joint venture, with substantially less bargaining power vis-à-vis prices and quality of products and services bought from or sold to Defendants; and

(f) Plaintiffs' have been and will continue to be injured directly in their business and property as a result of Defendants' foregoing anti-competitive actions to limit competition.

## COUNT I
**(Against All Defendants)**
**(Unlawful Restraint of Trade-Sherman Act Section 1)**

109.    Plaintiffs hereby re-allege and incorporate by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

110.    Defendants' foregoing combination, agreements and conspiracy  restrains trade in the Catskill Region Racing/Gaming market and the Catskill Region Resort Tourism market for

related ancillary lodging, dining, shopping and entertainment products and services, and is effected through an unlawful group boycott of Plaintiffs, an unlawful refusal to deal with Plaintiffs, and a denial of essential facilities to Plaintiffs, all with the purpose and effect of excluding Plaintiffs from such markets for the purpose of preserving and extending Defendants' Empire's and Monticello's monopoly in such markets, with the monopoly rents to be shared among Defendants in consideration of their conspiracy.

111.    The restraints of trade effected by Defendants' conspiracy serve no legitimate business reason and have no pro-competitive benefits.

112.    The conspiracy by and between Defendants has had and will have the effects of suppressing competition in these markets and such effects are not *de minimis* or minute but substantial and significant.

113.    The combination, agreements and conspiracy among Defendants to inhibit competition has adversely affected and will adversely affect interstate commerce.

114.    As a direct result of this unlawful conspiracy and Defendants' anticompetitive acts in furtherance of their conspiracy, Plaintiffs have been injured and will continue to be injured in their business by their inability to compete effectively, and by a loss of actual and potential business, and by the loss of profits from all the above.

115.    Plaintiffs' and consumers' injuries are the type of injuries the antitrust laws were designed to prevent, and flow from that which make Defendants' conduct unlawful.

116.    Defendants' antitrust violations threaten continuing and irreparable loss and injury to Plaintiffs and consumers.

## COUNT II
### (Against All Defendants)
### (Conspiracy to Monopolize-Sherman Act Section 2)

117.    Plaintiffs hereby re-allege and incorporate by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

118.    Defendants, by their action identified above, have willfully, knowingly, intentionally, and with specific intent to do so, conspired and continue to conspire to preserve and maintain for Defendant Empire its monopoly over the Catskill Region Racing/Gaming market in violation of 15 U.S.C. § 2.

119.    In furtherance of this conspiracy, the Defendants have willfully, intentionally, and with specific intent to do so conspired to preclude Plaintiffs from competing with Empire in the Catskill Region, by refusing to deal with Plaintiffs and denying Plaintiffs the use of the Racino Tract, a facility that is essential for Empire's only viable would-be competitor, Plaintiffs, to establish the competing Casino/Hotel Project.

120.    The natural and probable consequences of Defendants' conspiracy and Defendants' acts in furtherance of this conspiracy were to suppress, reduce, and eliminate competition in the relevant market, consequences that were plainly intended and foreseeable by Defendants.

121.    Defendants' conspiracy to monopolize the Catskill Region Racing/Gaming market, has affected and continues to adversely affect interstate commerce.

122.    The Defendants' conspiracy has no legal business purpose and exists solely to prevent competition in the relevant market.

123.    The conspiracy has caused, and will continue to cause, substantial adverse effects in the Catskill Region Racing/Gaming market, and the Catskill Region Resort Tourism market.

It will suppress, reduce, and eliminate such competition, and thus enable Defendants to charge supra-competitive prices in these markets, and eliminates or reduces options for consumers, horsemen and employees.

124.    As a direct result of this unlawful conspiracy Plaintiffs have been injured and will continue to be injured in their business and property by the resulting preclusion of their inability to compete effectively, their loss of investment, loss of opportunity, and loss of profit.

125.    Plaintiffs', consumers' and horsemen's injuries are the type of injuries the antitrust laws were designed to prevent, and flow from that which make Defendants' conduct unlawful.

126.    Defendants' antitrust violations have caused and will cause continuing and irreparable loss and injury to Plaintiffs, consumers, horsemen and other participants in the relevant market economies.

## COUNT III
### (Against All Defendants)
### (Unlawful Monopolization – Sherman Act Section 2)

127.    Plaintiffs hereby re-allege and incorporate by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

128.    By their foregoing acts, Defendants Empire and Monticello have perpetuated their monopoly in the Catskill Region Racing/Gaming market in violation of 15 U.S.C. § 2.

129.    However, Empire and Monticello could not perpetuate that monopoly without the knowing, intentional and substantial assistance of the EPT Defendants.

130.    Empire's monopolization of the Catskill Region Racing/Gaming market has affected and continues to affect interstate commerce adversely.

131.    Empire's monopoly has caused, and will continue to cause, substantial adverse effects in the market for racing and wagering, and the related Catskill Region Resort Tourism market.  It suppresses, reduces, and eliminates competition, and thus enables Empire to charge, and consumers and horsemen to pay, supra-competitive prices for racing and gaming products and services.

132.    Empire's and Monticello's monopoly is an illegal monopoly that violates Section 2 of the Sherman Act.

133.    The EPT Defendants are liable jointly and severally with empire and Monticello as aiders and abettor of the illegal monopoly who shares its monopoly rents.

134.    As a direct result of Empire's illegally maintained monopoly, Plaintiffs have been injured and will continue to be injured in their business and property by their inability to compete effectively, and by a loss of actual and potential business, and by the loss of invested capital, loss of opportunity and lost profits from all the above.

135.    Plaintiffs' and consumers' injuries are the type of injuries the antitrust laws were designed to prevent, and flow from that which make Empire's conduct unlawful.

136.    Empire's continued monopolization has caused and will cause continuing and irreparable loss and injury to Plaintiffs and consumers, horsemen and other participants in the relevant market economies.

## COUNT IV
**(Against Defendants Empire Resorts, Inc. and Monticello Raceway Management Inc.)**
**(Tortious Interference With Contract)**

137.    Plaintiffs hereby re-allege and incorporate by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

138.    As set forth herein above, at all relevant times there existed contracts between Associates and EPT Defendants.

139.    Defendants Empire and Monticello knew about the existence of the agreements between Associates and EPT Defendants.

140.    As detailed herein more fully above, Defendants Empire and Monticello willfully and intentionally interfered with the EPT Defendants' performance of their obligations and otherwise induced EPT Defendants induced to breach or repudiate their obligations under the agreements.

141.    EPT Defendants have breached one or more of their obligations under the terms of the agreements.

142.    As a direct and proximate result of the foregoing, Associates has been made to suffer damages in an amount to be determined at trial but believed to be in excess of $500 million, together with interest.

143.    By reason of the foregoing, Associates demands judgment against Defendants Empire and Monticello in an amount to be determined at trial, but not less than $500 million, together with interest.

## COUNT V
**(Against Defendants Empire Resorts, Inc. and Monticello Raceway Management Inc.)**
**(Tortious Interference with Business Relations)**

144.    Plaintiffs hereby re-allege and incorporate by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

145.    At all relevant times, Plaintiffs were in an existing and a prospective business relationship with EPT Defendants.

146.    Defendants Empire and Monticello knew about, and intentionally and maliciously interfered with, Plaintiffs' business relations with the EPT Defendants, by use of dishonest, unfair, and/or improper or illegal means, and were otherwise taken without reasonable justification and with the purpose and intent of causing harm to Plaintiffs.

147.    By virtue of the conduct alleged, Defendants Empire and Monticello actually interfered with Plaintiffs' ability to obtain the benefits of its business relations with EPT Defendants, to the detriment of Plaintiffs.

148.    As a direct and proximate result of Defendants Empire's and Monticello's conduct, Plaintiffs have been made to suffer injury to their business relationship with EPT Defendants, and have thereby been made to suffer actual and special damages in an amount to be determined at trial, but believed to be not less than $500,000,000.

149.    By reason of the foregoing, Plaintiffs demands Judgment against Defendants Empire and Monticello in an amount to be determined at trial, but not less than $500,000,000, together with interest.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demand the following relief:

   a)   an injunction against Defendants ordering them to cease and desist from their unlawful conspiracy in restraint of trade, conspiracy to monopolize the Catskill Region Racing/Gaming market, and attempted monopolization of the Catskill Region Racing/Gaming market;

   b)   an award of the actual damages that Plaintiffs have sustained due to the Defendants' unlawful conduct as alleged herein in an amount to be determined at trial but not less than $500 million;

c)   an award trebling such damages to an amount not less than $1.5 billion as

mandated by law;

d)   punitive damages against Empire on Counts IV and V;

e)   pre-judgment interest and  post-judgment interest from the date of entry until

the date of satisfaction at the highest rates allowable by law;

f)   an award of reasonable attorneys' fees and costs incurred by Plaintiffs in this

action; and

g)   such additional relief, legal or equitable, to which plaintiff may be entitled.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Dated: White Plains, NY
       March 7, 2012

Respectfully Submitted,

LOWEY DANNENBERG COHEN & HART, P.C.

By: _Richard W. Cohen_
       Richard W. Cohen
       Uriel Rabinovitz
       One North Broadway, Fifth Floor
       White Plains, New York 10601
       Tel:    (914) 997-0500
       Fax:    (914) 997-0035
       E-Mail: rcohen@lowey.com


       DELBELLO DONNELLAN WEINGARTEN WISE &
       WIEDERKEHR, LLP
       Alfred E. Donnellan
       Michael J. Schwartz
       One North Lexington Avenue
       White Plains, NY 10601
       Telephone: (914) 681-0200