IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

CONCORD ASSOCIATES, L.P.,                  :
CONCORD RACEWAY CORPORATION,               :
CONCORD KIAMESHA CASINO LLC,               :
CONCORD KIAMESHA CAPITAL CORP.,            :
CONCORD RESORT, LLC,                       :       Civ. No. 12-cv-1667 (ER)
CONCORD KIAMESHA, LLC, and                 :
CONCORD KIAMESHA HOTEL , LLC               :
                                           :
                        Plaintiffs,        :       **JURY TRIAL DEMANDED**
                                           :
             v.                            :
                                           :
ENTERTAINMENT PROPERTIES TRUST,            :
EPT CONCORD, LLC, EPT CONCORD              :
II, LLC, EMPIRE RESORTS, INC.,             :
MONTICELLO RACEWAY MANAGEMENT,             :
INC., KIEN HUAT REALTY III LIMITED,        :
GENTING NEW YORK LLC, and                  :
JOHN DOES 1 TO 5,                          :
                                           :
                        Defendants.        :

-------------------------------------------------------------x

## <u>AMENDED COMPLAINT</u>
### (Redacted Version)

Plaintiffs Concord Associates, L.P. ("Associates"), Concord Raceway Corporation

("Raceway Corp."), Concord Kiamesha Casino LLC ("Casino"), Concord Kiamesha Capital

Corp. ("Capital"), Concord Resort, LLC ("Resort LLC"), Concord Kiamesha, LLC

("Kiamesha") and Concord Kiamesha Hotel, LLC ("Kiamesha Hotel") (collectively, "Plaintiffs")

hereby sue Defendants Entertainment Properties Trust ("EPT"), EPT Concord, LLC ("EPT

Concord"), EPT Concord II, LLC ("EPT Concord II") (collectively, "Entertainment Properties"

or the "EPT Defendants"), Defendants Empire Resorts, Inc. ("Empire") and Monticello Raceway

Management, Inc. ("Monticello") (Empire and Monticello are referred to collectively as

"Empire,"), Kien Huat Realty III, Limited ("Kien Huat Realty"), John Doe entities 1-5 (Kien Huat Realty and the John Doe entities are referred to collectively as "Kien Huat"), and Genting New York LLC ("Genting USA") (Kien Huat and Genting USA are referred to collectively as the "Genting Defendants" and are referred to collectively with Empire and the EPT Defendants as "Defendants") pursuant to the antitrust laws of the United States.  Upon knowledge as to their own actions, matters of public record, and otherwise upon information and belief and investigation by themselves and by their attorneys, Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.     Plaintiffs have invested more than $100 million to date to develop a full service destination casino resort at the site that formerly housed the historic Concord Hotel, in the Town of Thompson, Sullivan County, located in the Catskills Mountains of New York (the "New Concord Casino Resort").

2.     The development plans for the New Concord Casino Resort feature a fully integrated casino-resort complex, combining casino gaming with a high-quality hotel, dining, nightlife, shopping and a spa.

3.     Plaintiffs expect the New Concord Casino Resort to draw patrons principally from among the 18-20 million people who live within approximately 100 miles of the proposed resort.

4.     Unlike most existing casinos that serve that population, Plaintiffs expect to attract substantial patronage from overnight guests who will stay at the resort or elsewhere in the Catskills region.  Even in its currently economically depressed state, the Catskills region continues to draw millions of overnight tourists annually due to its many desirable cultural and natural attractions.

5.      According to the Sullivan County Visitors Association, in 2009 tourists paid more than 3.5 million overnight visits to the Catskills region.

6.      The New Concord Casino Resort would be located in the epicenter of the Catskills region in the Town of Thompson in Sullivan County, two miles from Route 17, where more than 12 million vehicles currently drive by the site annually.

7.      Plaintiffs are ready and able to develop the New Concord Casino Resort subject to the cooperation of the EPT Defendants, who own land essential to the gaming components of Plaintiffs' New Concord Casino Resort development plans.

8.      The ability to offer casino gaming is an essential economic prerequisite to Plaintiffs' development of the New Concord Casino Resort.  Under New York law, Plaintiffs would have to operate a harness racing track on the site offering parimutuel wagering on the races as a condition precedent to offer casino gaming.  Enterprises that offer both racing and casino gaming are called "racinos."

9.      In June 2010, the EPT Defendants and Plaintiffs entered into agreements to enable Plaintiffs to lease and/or acquire certain land from the EPT Defendants that is essential to Plaintiffs' ability to build the racino.

10.      Until 2011, the EPT Defendants cooperated with Plaintiffs and acted in good faith to carry out agreements with Plaintiffs to advance the development of the New Concord Casino Resort.

11.      Since 1958, the Empire Defendants have operated the Monticello Raceway four miles from the site of the proposed New Concord Casino Resort.  In 1993, Empire became the owner and operator of the Monticello Raceway.  In 2004, Empire began operating a casino at the

Monticello Raceway, which was renamed "Monticello Casino and Raceway" ("Monticello Casino").

12.     At all times since 1958, Monticello Raceway was the only harness racetrack in the Catskills region, and since June 2004, Monticello Casino has been the only casino or race track in the Catskills region.  The nearest harness track and casino in New York is in Yonkers, almost 100 miles away.

13.     Until 2009, Empire cooperated with Plaintiffs' efforts to develop the New Concord Casino Resort, including entering into agreements with Plaintiffs to further their ability to develop and operate a harness racing track.

14.     However, in November 2009, Defendant Kien Huat Realty and Fook Yew Au ("Colin Au"), an executive of a number of Kien Huat Realty affiliates, acquired majority ownership of Empire.

15.     Following Kien Huat's and Colin Au's acquisition of majority control over Empire, Empire's cooperation with Plaintiffs ceased, and Empire has tried to obstruct Plaintiffs' ability to develop the New Concord Casino Resort.

16.     In October 2011, Defendant Genting USA opened a casino at Aqueduct Park in Jamaica, New York ("Resorts World Casino"), approximately 100 miles from the site of the proposed New Concord Casino Resort.  Almost overnight, Resorts World Casino, drawing patrons principally from the New York City metropolitan area, became the most profitable casino, in slot machine revenue, in the United States, generating $57.5 million in May 2012 alone.

17.     Defendant Genting USA is a subsidiary of the Malaysian conglomerate Genting Berhad, one of the largest gaming companies in the world.

18.     Kien Huat Realty sdn bhd, an affiliate of Defendant Kien Huat Realty, is the 39.6% owner of Genting Berhad.  Through various entities (Defendants John Doe entities 1-5) controlled by Genting Berhad's Chairman and Chief Executive Lim Kok Thay, Kien Huat exercises operating control over both Defendant Empire and Defendant Genting USA, with Kien Huat's executive, Colin Au, serving as the *de facto* chief executive of both companies.

19.     Beginning in 2011 and continuing to the present, the EPT Defendants entered into agreements, combinations and conspiracies with the Empire Defendants and the Genting Defendants (both of which are controlled by Kien Huat and Colin Au) to stop cooperating with Plaintiffs and to obstruct and delay Plaintiffs' efforts to complete development of the New Concord Casino Resort site.

20.     Through the present, following their entry into the agreements, combinations and conspiracies with the Empire Defendants and the Genting Defendants, the EPT Defendants (i) stopped cooperating with Plaintiffs, (ii) repudiated their obligation under agreements with Plaintiffs and (iii) acted unfairly and in bad faith to (a) obstruct Plaintiffs' efforts to fulfill their obligations under such agreements and (b) create pretextual grounds to attempt to avoid their obligations under  such agreements.

21.     Such efforts of the EPT Defendants, acting in concert with the Empire Defendants and Genting Defendants, have impaired and delayed the Plaintiffs' ability to successfully complete or advance the development of the New Concord Casino Resort.

22.     This is an antitrust action, challenging actions taken in concert by Empire, Genting USA, Kien Huat and the EPT Defendants to obstruct, delay, and otherwise interfere with Plaintiffs' ability to develop the New Concord Casino Resort.  To foreclose Plaintiffs' access to property owned by EPT that is essential to Plaintiffs' development of the New Concord

Casino Resort, Empire and the Genting Defendants have entered into agreements with the EPT Defendants and paid the EPT Defendants not to cooperate with Plaintiffs, and disavow or repudiate agreements with Plaintiffs.

23.     Genting USA's and Kien Huat's motivations to block Plaintiffs' development are principally to prevent new competition for the Monticello Casino (a motivation they share with Empire) and Resorts World Casino.  In addition, Empire and Kien Huat want to usurp for Empire certain economically advantageous gaming opportunities that Plaintiffs have developed to operate a casino at the site of the New Concord Casino Resort, and to prevent any prospective competitors from having access to such opportunities.

24.     Thus far, Empire has paid the EPT Defendants at least $750,000 since 2011 and agreed to make additional conditional payments of at least $750,000.

25.     Empire and the Genting Defendants have effected their scheme by, among other things, (a) reaching agreements and understandings with the EPT Defendants whose purposes and effects have been to (i) delay giving Plaintiffs access to property at the site of the former Concord Hotel ("Concord Site" or Concord Property") that is essential for the Plaintiffs' construction of the racino component of the New Concord Casino Resort; (ii) disavow a restrictive covenant and other contractual rights that EPT previously agreed to, giving Plaintiffs the exclusive right to build a harness track and racino on the Racino Tract (as hereinafter defined) of the Concord Property; (iii) sabotage Plaintiffs' efforts to consummate a $395 million bond offering in October 2011 and obtain a related $50 million loan for construction of the New Concord Casino Resort by (a) withholding and denying obligations to transfer leasehold rights Plaintiffs have to EPT Defendants' land that is essential to Plaintiffs' development of a racino when Plaintiffs' $395 million bond offering was imminent and continuing to do so until after

Plaintiffs filed this lawsuit, and (b) issuing press releases jointly with the Empire Defendants which were intended to and did cause doubt in the U.S. debt markets over whether Plaintiffs have the rights or ability to develop the New Concord Casino Resort on portions of the EPT Defendants' land; and (iv) prosecute collusively a sham Article 78 proceeding against the Town of Thompson, and against Plaintiff Associates, in an attempt to sabotage Plaintiffs' financing and delay Plaintiffs' government approvals for the development of the New Concord Casino Resort.

26.    By this action, Plaintiffs seek treble damages from Defendants, jointly and severally, estimated at $1.5 billion, and permanent injunctive relief to end Defendants' anticompetitive collusion and to permit Plaintiffs to proceed with the development of the New Concord Casino Resort.

## JURISDICTION AND VENUE

27.    The Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337(a).  Plaintiffs' claims arise under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, Section 16 of the Clayton Act, 15 U.S.C. § 26, Section 4 of the Clayton Act, 15 U.S.C. § 15.

28.    The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, all of which are so related to the claims in the action within the Court's federal question jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

29.    Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391. All or a substantial part of the property at issue in this action is situated within this District, Defendant Empire has its principal place of business within this District, and a substantial part of the events or omissions giving rise to the claims in this action occurred in this District.

## THE PARTIES

30.     Plaintiff Associates is a New York limited partnership duly organized and existing under the laws of the State of New York with its principal place of business at 115 Stevens Avenue, Valhalla, New York 10595.

31.     Plaintiffs Raceway Corp. and Capital are corporations duly organized and existing under the laws of the State of New York, with their principal place of business at 115 Stevens Avenue, Valhalla, New York 10595.

32.     Plaintiffs Casino, Resort LLC, Kiamesha and Kiamesha Hotel are Delaware limited liability companies duly organized and existing under the laws of the State of Delaware, are authorized to do business in the State of New York, with their principal place of business at 115 Stevens Avenue, Valhalla, New York 10595.

33.     Defendant EPT is a Maryland real estate investment trust having its principal place of business located at 30 West Pershing, Suite 201, Kansas City, Missouri 64108.

34.     Defendants EPT Concord and EPT Concord II are limited liability companies organized and existing under the laws of the State of Delaware, are authorized to do business in the State of New York, and have their principal place of business at 30 West Pershing, Suite 201, Kansas City, Missouri 64108.

35.     Defendants Empire and Monticello are corporations, organized and existing under the laws of the State of Delaware, with a principal place of business located at 204 Route 17B, Monticello, New York 12701.  Monticello is a wholly-owned subsidiary of Empire.

36.     Defendant Kien Huat Realty is an Isle of Man corporation headquartered in Kuala Lumpur, Malaysia.  The principal business of Kien Huat Realty is to act as an investment holding company for investments held under a trust for the benefit of Lim Kok Thay, a citizen of

Malaysia, and certain other members of his family.  Kien Huat Realty, along with its executive Colin Au, owns a majority interest in Defendant Empire.  Kien Huat exercises operating control over both Empire and Genting USA, through its ownership interests and the executive control exercised by Colin Au over both companies.

37.     Non-defendant Kien Huat Realty sdn bhd, an affiliate of Kien Huat Realty, is a private company located in Kuala Lumpur, Malaysia.  Kien Huat Realty sdn bhd owns 39.6% of and exercises operating control over Genting Berhad and its subsidiaries.

38.     Non-defendant Genting Berhad, located in Malaysia, is the parent company and holding company of subsidiaries and affiliates operating under the "Genting" name ("Genting Group").  Genting Berhad had a combined market capitalization of over RM119 billion ($38 billion) as of May 31, 2012.

39.     Non-defendant Genting Malaysia Berhad, a subsidiary of Genting Berhad is located in Kuala Lumpur, Malaysia.  Genting Malaysia Berhad is currently listed on the Main Market of the Bursa Malaysia Securities Berhad. (Bloomberg: GENT MK; Reuters: GENT KL; Bursa Malaysia: GENTING 3182).  Genting Malaysia Berhad is one of the largest listed companies in Malaysia with a market capitalization of about RM37.2 billion ($11.7 billion) as of May 31, 2012.  Genting Berhad owns 49.3% of Genting Malaysia Berhad.

40.     Defendant Genting USA is a limited liability company organized and existing under the laws of the State of Delaware, and authorized to do business in the State of New York, with a principal place of business at 110-00 Rockaway Blvd. Jamaica, NY 11420.  Genting USA is a wholly-owned subsidiary of Genting Malaysia Berhad.  Genting USA owns and operates Resorts World Casino.

41.     John Does 1-5 are the jural entities, whose identities are presently unknown, that serve as the corporate agents and holding companies within the complex web of companies through which Lim Kok Thay (or trusts for his benefit) controls Empire and Genting USA.  Lim Kok Thay is the Chairman and Chief Executive of Genting Berhad and Genting Malaysia Berhad.

## FACTS

### New York State Gaming

42.     In 2001, New York enacted legislation authorizing the issuance of licenses to operate video lottery terminals ("VLTs") at licensed harness race tracks and thoroughbred race tracks in the State.  In 2009, New York State Lottery authorized the tracks to add electronic table games ("ETGs").  VLTs are gaming machines, similar in appearance to casino slot machines.  ETGs simulate table games like roulette, blackjack and craps.  All VLTs and ETGs (collectively "VGMs") are connected to a centralized computer system that allows New York State to monitor game play and collect its share of the revenue therefrom.

43.     Since 2004, two New York thoroughbred tracks (Finger Lakes and Aqueduct) and all seven of New York's harness racing tracks have opened racinos offering VGM gaming.

44.     There are a total of eight licenses available from the New York State Department of Racing and Wagering to operate harness race tracks in New York.  Seven of the licenses are issued to the seven operating harness tracks in New York State and one license is available for issuance.  That eighth license had been earmarked for issuance to Plaintiff Raceway Corp. to establish and operate a harness race track at the Concord Site as described herein.

45.     All nine of New York's existing racinos are stand-alone race tracks, unaffiliated with and unconnected to resort tourism facilities such as hotels or golf courses.

46.     According to a January 2012 report commissioned by the New York Gaming Association, an organization comprised of New York's nine racino owners (including Defendants Empire and Genting USA) as of the end of 2011, New York racinos were, on an annualized basis producing $25.13 billion in VGM play, and $1.767 billion in net win shared between the State and the racino operators, who employ approximately 17,400 people.

47.     In March of 2012, the New York State Legislature passed the first of two bills necessary to permit a planned November 2013 voter referendum to amend the State's Constitution to allow full-fledged Las Vegas-style casinos, including live table games, within New York.

**Plaintiffs' Efforts to Redevelop the Concord Property**

48.     The Concord Property, comprising approximately 1,600 acres adjacent to Kiamesha Lake, was the site of the Concord Resort Hotel, a world-famous vacation destination for visitors to the Catskills region for half a century, until its closing in 1998.  The Concord featured over 1,500 guest rooms, a dining room that seated 3,000 where top live entertainment took place, and championship golf.

49.     However, beginning in the late 20th Century and continuing to the present, the Catskills region has endured a severe economic recession with diminishing tourism revenues followed by high levels of unemployment and poverty.

50.     Since the 1990s, a key element of efforts by New York State and Catskills region authorities to revive Catskills region tourism has been the proposed development and expansion of legal gaming in Sullivan County as the centerpiece of new commercial development to attract new tourism and provide employment in the region.

51.     In 1997, after the New York State Legislature failed to pass a bill authorizing a referendum to permit legalized gaming in the region, the Concord Resort Hotel went into bankruptcy, owing Sullivan County more than $8 million of property taxes.

52.     In 1999, Plaintiff Associates, headed by Louis R. Cappelli, bought the Concord Property from the bankruptcy estate.  Associates transferred a portion of the property to its affiliate Resort LLC in 2008.  Resort LLC transferred that portion of the property to Defendant EPT Concord II in June 2010.

53.     Louis R. Cappelli is a New York–based real estate developer who has designed and developed more than twenty million square feet of mixed use, retail, residential, office, medical and parking facilities throughout the Northeast United States.

54.     Cappelli's real estate development projects have revitalized the previously depressed downtown districts of New Rochelle and White Plains with large scale mixed-use developments, including White Plains City Center, Trump Tower White Plains, Trump Plaza New Rochelle, The Ritz-Carlton Hotel in White Plains, The Residences at The Ritz-Carlton, Westchester, The Lofts at New Roc and New Roc City in New Rochelle.

55.     Since buying the Concord Site out of bankruptcy in 1999, Cappelli, through Associates and related companies under his management, has invested more than $100 million toward development of the New Concord Casino Resort, a high end tourism resort destination, offering a luxury hotel, name entertainment, championship golf and—most importantly—legal gaming at the Concord Site, which would revitalize Sullivan County and the Catskills region as a tourism destination.

**Associates Obtains Approvals to Construct its
New Concord Casino Resort**

56.     From 1999 until June 18, 2010, Plaintiff Associates and Plaintiff Resort LLC, an

affiliate of Associates, owned all 1,600-plus acres comprising the Concord Site, including (a) the approximately 1,500 acres housing two golf courses, some residential properties and vacant land (the "Resort Property"); and (b) the approximately 140 acres identified on the tax assessment map of the Town of Thompson, County of Sullivan as Section 9, Block 1, Lots 34.1, 34.2, 34.4, 34.5, 34.6 and 34.7, where the Concord Hotel used to be (the "Casino Property").

57.     In 2000, Associates began the approvals process to permit the redevelopment of the Concord Site with a new mixed use plan including new resort facilities, commercial uses, residential uses, restoration of the golf courses and other related amenities and infrastructure.

58.     On or around November 21, 2006, and after an exhaustive review under the New York State Environmental Quality Review Act ("SEQRA") and other applicable State and local laws, rules and regulations, Associates obtained all necessary administrative approvals from the Town Board of the Town of Thompson (the "Town Board") and the Planning Board of the Town of Thompson (the "Planning Board") to permit the redevelopment by Plaintiffs of the Concord Site.

59.     In or around March 2008, Associates submitted an application to the Town Board and the Planning Board to permit the development by Plaintiffs of the key components of the New Concord Casino Resort, including a hotel and gaming facility, a harness horse racetrack, and other related improvements on the Casino Property and a portion of the Resort Property.

60.     In or around April 2008, Associates received all necessary approvals from the Town Board and Planning Board to permit the construction of the proposed New Concord Casino Resort.

61.     In or around September of 2008, the Building Inspector for the Town of Thompson issued building permits permitting Associates to construct its approved racetrack

paddock and maintenance building, the grandstand for the racetrack and for the casino, parking

structure and hotel (the "Building Permits").

62.     Thereafter, Associates performed substantial work at the project site in reliance

upon the Building Permits, including, without limitation, demolition, pre-construction work, site

work, substantial environmental remediation work, and foundation work.

63.     Associates has spent more than $100 million on the approvals and development of

the Concord Site.

**Associates Obtains Comfort Letters from New York State Regarding Issuance
of a Racino License and Statutory Benefits From the State for the Proposed Racino**

64.     On January 15, 2009 and February 23, 2009, affiliates of Plaintiffs received from

the New York State Department of Racing and Wagering ("NYS Racing") and from the Division

of Lottery (the "Lottery Commission") preliminary approvals for a racino license for the New

Concord Casino Resort.  This license would permit racing/wagering and a casino/hotel at the

Concord Site.  These approvals were in the form of comfort letters (the "Comfort Letters"), that

indicated that licensing would be granted to Plaintiffs upon completion of a project in accordance

with its approved plans and upon compliance with other conditions.  New Comfort Letters

confirming the conditional approval were issued thereafter by NYS Racing and the Lottery

Commission to Raceway Corp. on May 25, 2011 and September 16, 2011.

65.     In August 2009, the State of New York, as an incentive for new investment in and

creation of new employment in the Catskills region, adopted legislation to permit the one new

racino to be located at the site of the former Concord Resort to retain a far greater percentage of

its VGM revenues than the rates applicable generally to other New York racinos.  This

legislation made the Concord Site a unique facility for development of a racino and served as an

incentive to Plaintiffs to build the New Concord Casino Resort there, and thereby create more

than 1,500 permanent new jobs, which is one of the conditions for obtaining the favorable statutory VGM win rate.  *See* N.Y. Tax Law § 1612b(1)(G).

**The Transfer of the Resort Property to EPT Concord II**

66.     Defendant EPT Concord II acquired title to the Resort Property from Plaintiff Resort LLC on or about June 18, 2010, as part of a global settlement intended to resolve several lawsuits between Defendant Entertainment Properties and Plaintiff Associates, and other affiliates of Louis R. Cappelli.  The lawsuits had been pending in the United States District Court for the Western District of Missouri and in the Supreme Court of the State of New York.

67.     Pursuant to the terms of the settlements, Plaintiff Associates retained the Casino Property (approximately 140 acres), and Plaintiff Resort LLC transferred the Resort Property (approximately 1,500 acres of the Concord Property adjacent thereto) to Defendant EPT Concord II.

68.     However, Plaintiff Resort LLC's agreement to transfer the Resort Property was subject to certain rights in that land that the parties agreed would be reserved for Plaintiffs' exclusive use and exploitation specifically to enable Plaintiffs to proceed with and complete development of the New Concord Casino Resort.

69.     As part of the consideration for Plaintiff Resort LLC's transfer of the Resort Property to Defendant EPT Concord II, EPT Concord II entered into a June 18, 2010 Casino Development Agreement (the "CDA") with Plaintiff Associates, Plaintiff Resort LLC and Plaintiff Kiamesha.

70.     In the CDA, Defendant EPT Concord II agreed to provide Plaintiffs with, *inter alia*, certain easements, leases and other rights regarding the use and development of a hotel, a racing and gaming facility and other improvements on the Resort Property.

71.     The settlement specifically reserved for Plaintiffs a right to lease the "Racino Tract," consisting of a portion of the Resort Property on a tract adjacent to the Casino Property, upon which Plaintiff Kiamesha planned to build and operate a licensed 5/8th mile oval harness racetrack and parimutuel wagering complex containing approximately 33,000 square feet of indoor and outdoor seating, a 45,000 square foot padlock area, a 13,000 square foot maintenance barn and related ancillary surface parking (the "Racino Tract").

72.     Under the terms of the CDA, EPT Concord II was obligated to deliver to Associates within the first two years of its term, a ground lease for the Racino Tract for an annual rent of $1.00, prior to development of the racino, upon satisfaction of financing conditions requiring Plaintiffs to raise up to $275 million for such purposes.

73.     The CDA further provides that, even if the financing condition were not satisfied within two years, EPT Concord II was still obligated to deliver the ground lease to Plaintiff Casino by June 19, 2012, for an annual rent of $200,000.

74.     Pursuant to the CDA, EPT Concord II is obligated to transfer to Plaintiff Kiamesha fee ownership of the Racino Tract following completion of construction of the racino by June 2015, and Plaintiffs would be entitled to all revenues from the facility.

75.     Another essential part of the consideration for the June 18, 2010 global settlement (of which the CDA was one component) was that Defendant EPT Concord II, as grantor, executed and delivered a restrictive covenant to Plaintiff Resort LLC, whereby EPT Concord II agreed that neither it nor its successors or assigns would own or operate any casino, racino, racing or gaming facility or any other facility offering games of chance on the Resort Property other than one operated by Plaintiffs (the "Restrictive Covenant").

76.     The Restrictive Covenant was recorded against the Resort Property on July 15, 2010 as Instrument No. 2010-56691.

77.     Defendants have known at all relevant times of, and encouraged, Plaintiffs' intentions, efforts and expenditures to acquire the one remaining available New York State racing license to build a harness track and to operate a racino on the Racino Tract as the centerpiece of the Plaintiffs' plans for the New Concord Casino Resort.

**Associates Partners with Mohegan Sun**

78.     On or about April 7, 2011, Associates entered into a term sheet with Mohegan Gaming New York, LLC, an affiliate of the Mohegan Tribal Gaming Authority, one of the United States' leading gaming hospitality operators, to jointly develop and operate the New Concord Casino Resort, which would be known as "Mohegan Sun at the Concord."

79.     Mohegan Sun at the Concord would consist of an 800,000 square foot full service facility including:

(a)     Approximately 63,000 square feet of gaming space with approximately 2,500 VGMs, a high end VIP gaming area and simulcast facility for parimutuel horse race wagering;

(b)     A 252 room hotel tower connected directly to the gaming floor, featuring upscale hotel rooms averaging 450 square feet, including 21 suites, and 24 hour room service and a fitness center;

(c)     Live racing on a 5/8 mile harness race track, including an approximately 33,000 square foot two level complex with indoor and outdoor seating, private luxury boxes and simulcast parimutuel wagering;

(d)　　Nine diverse dining options, including a signature steak house with at least 130 seats, a casual branded restaurant with at least 130 seats, an approximately 500 seat full-service buffet, an approximately 180 seat 24 hour café and five branded quick service venues in a food court setting;

(e)　　Approximately 30,000 square feet of state of the art meeting and event space;

(f)　　An approximately 250 seat entertainment lounge and a centrally located bar and lounge on the gaming floor;

(g)　　Championship golf, including a new club house through the Entertainment Properties golf course lease provided for in the CDA; and

(h)　　Approximately 2,750 parking spaces, including over 300 underground valet spaces.

80.　　An experienced group of professionals with a strong track record of completed casino, racetrack and hospitality projects was assembled by Plaintiff Associates to develop and construct the Mohegan Sun at the Concord.

81.　　The planning and design of the New Concord Casino Resort was managed by Marnell Architecture, an affiliate of Marnell Companies, a world renowned architecture, design and development firm with decades of experience in some of the most complex, high profile projects in the gaming and lodging industry, including Wynn Resort, the Mirage and MGM in Las Vegas.

82.　　Construction, zoning, and other real estate permits and approvals necessary to construct the New Concord Casino Resort, based on 60% complete construction design, were obtained.

83.     Jefferies & Company, Inc. ("Jefferies"), a global securities and investment banking group with expertise in the gaming market, agreed to manage a private placement offering to raise $395 million in debt to satisfy the CDA financing requirements and provide additional financing for the New Concord Casino Resort— "Mohegan Sun at the Concord."

84.     Mohegan Sun at the Concord was scheduled to open in the summer of 2013.

**The Defendants Cooperate to Obstruct Plaintiffs'**
**Development of the New Concord Casino Resort**

85.     Until approximately the end of 2009, Defendant Empire cooperated with Plaintiffs' efforts to develop a racino on the Racino Tract.

86.     In a March 23, 2009 agreement between Plaintiff Associates and Defendant Empire, Empire agreed to provide management services to Plaintiff Raceway Corp. at Plaintiffs' proposed new harness track.

87.     In that March 23, 2009 agreement, Empire acknowledged that the issuance of the eighth and final harness track license to Plaintiff Raceway Corp., a prerequisite for the completion of the New Concord Casino Resort, would revitalize and invigorate the economy and tourism industry in Sullivan County.

88.     However, in November 2009, Defendant Kien Huat Realty and Colin Au, a senior Genting Group executive, acquired majority ownership of Empire.

89.     Shortly thereafter, Cappelli, who was then a director of Empire, introduced Colin Au to the operators of Aqueduct Race Track with a view to Empire operating a racino there.

90.     However, shortly after that meeting, Genting USA, which Kien Huat also controls and for which Colin Au also serves as *de facto* CEO, acquired the rights to operate a racino at Aqueduct Park to build and operate what is now Resorts World Casino.

91.     Since acquiring the racino rights at Aqueduct, Genting USA has lobbied against New York providing gaming licenses anywhere within driving distance of Resorts World Casino, arguing that as a matter of business necessity, it must be permitted to operate with a geographic gaming monopoly.

92.     On June 21, 2011, the *Thoroughbred Times* cited Colin Au's objection to New York State's plans in 2010 to allow an Indian casino in Sullivan County, and proposals in 2011 to allow an Indian casino on Long Island, quoting Colin Au as stating that new casinos located anywhere that is close to Genting USA's Resorts World Casino "would be disastrous" forcing that casino (despite its more than $50 million a month in gaming "win" revenue) "to close shop," and that the "private sector cannot allow this to happen.".

93.     On June 27, 2011, *The Times Union* (the major Albany area daily) quoted Colin Au's statement in opposition to the prospect of new Indian gaming facilities in New York State, that "the threat from the Indians are many, they can stay at their reservations, they have their rights, [but] you should not let them encroach in the main metropolitan areas."

94.     By the beginning of 2010, shortly after Kien Huat Realty acquired majority control of Empire, Empire stopped cooperating with Plaintiffs, and made a 180 degree turn, doing whatever it could to undermine the efforts of Plaintiffs (Empire's only viable competitor in the Catskills region and a prospective competitor to Resorts World Casino for gamblers from the New York City metropolitan area) to complete development of the New Concord Casino Resort, culminating in Empire's inducement to Entertainment Properties to stop cooperating with Plaintiffs.

95.     In the months following the June 18, 2010 CDA, Defendant Entertainment Properties cooperated with and facilitated Plaintiffs' efforts to develop the New Concord Casino

Resort, while at the same time pursuing development of its own complementary theme park, housing and golf course and retail properties on their Resort Property.

96.     However, Entertainment Properties' conduct toward Plaintiffs changed sometime in late 2010 or early 2011, coinciding with agreements that it entered into with Empire after Kien Huat Realty acquired control of Empire.

97.     On April 12, 2011, Entertainment Properties and Empire announced publicly they had entered into an agreement (the "Exclusivity Agreement") to "explore the joint development of the companies' respective properties located in Sullivan County."  The announcement falsely stated that "Entertainment Properties Trust owns the former Concord Hotel property, 1,700 acres at the site of the former hotel in Kiamesha Lake," ignoring the roughly 140 acres of the former Concord Site which is owned by Plaintiffs.

98.     On or about June 24, 2011, Entertainment Properties and Empire announced that they had entered into a Master Development Agreement "to develop a comprehensive, integrated destination resort on the site of the former Concord resort" including a racino.  In that agreement, dated June 20, 2011, Entertainment Properties and Empire agreed to deal exclusively with each other and ████████████████████████  "██████████████████████ ████████████████████████████████."

99.     On August 4, 2011, Entertainment Properties and Empire announced that they had selected a master planner who would create a new master plan for the development of the Resort Property which would be anchored by a racino and have a harness racetrack, hotel, two golf courses, specialty lodging and complementary retail, which would violate the Restrictive Covenant.

100.   Since April 12, 2011, the EPT Defendants have refused to cooperate with Plaintiffs, citing their Exclusivity Agreement with Empire as a bar to such cooperation.

101.   From June 2011 through October 2011, Plaintiffs worked nonstop with Jefferies and other gaming experts to prepare an Offering Memorandum and related bond financing documents to raise $395 million.

102.   In addition to the $395 to be raised through the bond offering, Plaintiff Kiamesha had negotiated a $50 million loan from commercial lenders, Union Labor Life Insurance Company (ULLICO) and CIBC Inc. (a subsidiary of Canadian Imperial Bank of Commerce) to finance construction of the hotel at the New Concord Casino Resort.

103.   The net proceeds of Plaintiffs' proposed $395 million bond financing and $50 million loans would have more than satisfied the CDA financing conditions by as early as October 2011.

104.   However, Entertainment Properties, after weeks of reviewing and editing Plaintiffs' planned bond offering documents, in apparent cooperation with the Plaintiffs' financing efforts, suddenly stopped cooperating and refused Plaintiffs' request in October 2011 to issue the ground lease for the Racino Tract—even into escrow—just before the scheduled "road show" for the $395 million Jefferies bond offering.

105.   Entertainment Properties' refusal was a breach of the implied covenant of good faith and fair dealing and solely motivated by a desire to prevent Plaintiffs' successfully completing the $395 million Jefferies bond financing for the New Concord Casino Resort.

106.   Under the terms of the CDA, Entertainment Properties was obligated to eventually lease the Racino Tract to Plaintiff Associates irrespective of whether or not Plaintiffs

obtained financing in satisfaction of the CDA, making Entertainment Properties' refusal an obvious act of bad faith and unfair dealing with Plaintiffs.

107.     Entertainment Properties' counsel admitted to Plaintiffs' counsel that EPT would not issue the Racino Tract lease, even in escrow, due to the EPT Defendants' Exclusivity Agreement with Empire.

108.     EPT's turnaround of noncooperation, coupled with the April 12, 2011, June 24, 2011, and August 4, 2011 press releases caused Jefferies to cancel the financing and is now the subject of state court litigation between Plaintiffs Associates, Resorts LLC, Kiamesha and the EPT Defendants.

109.     Following Jefferies' cancellation of the $395 million financing, on November 10, 2011, NYS Racing withdrew the Comfort Letter, citing Plaintiffs' inability to provide written confirmation by November 7, 2011 of its ability to finance the racetrack at the Concord Site.

110.     On or about December 22, 2011, Empire and Entertainment Properties publically announced that they had entered into an Option Agreement, whereby Empire agreed to pay EPT Defendants $750,000 for an option to lease a portion of the Resort Property to pursue Empire's own racino project at the Concord Site to the exclusion of Plaintiffs' planned development.

111.     Defendants' April 12, 2011, June 24, 2011, August 4, 2011 and December 22, 2011 press releases intentionally omitted any mention of Plaintiffs' conflicting development rights with respect to the Racino Tract, or the Restrictive Covenant in Plaintiffs' favor with respect to the Resort Property, and implied that Plaintiffs' New Concord Casino Resort had been abandoned, and were intended to obstruct Plaintiffs' efforts to obtain financing for, and maintain the Comfort Letter for, development of a racino at the Concord Site.

112.     In EPT's July 28, 2011 Second Quarter Earning's Call, David Brain, President

and CEO of Defendant EPT, acknowledged that "Genting Group" was involved in the

Exclusivity Agreement and the development plans for the Concord Site, as the "silent third party

behind" Empire.

113.     In that Earnings Call, the following exchange took place:

> **Q – Anthony Paolone – JPMorgan Securities LLC>:** Okay. And then finally, Concord, I know you can't talk a lot about what's going on at this point. But just curious, it's a fairly large potential project. I'm not that familiar with gaming and financing that sort of thing. Can you point any other areas in the country right now or any similar projects you might be getting, big levels of financing, just how you think about the viability of getting something of that size financed right now and lining that up?
>
> **A – David Brain – President, Chief Executive Officer & Director>:** Well, I think – first of all, I think one of the points that we need to bring out is, you're talking about us getting financing for it. As we said, we wouldn't be involved in the construction of the gaming facility, so it wouldn't be us finding financing for that. Empire has stated that they have financial capability to execute on their plan. They had presented to the state a plan for the redevelopment of their existing facility already. So that is – it's anticipated that that will not be our burden to bear.
>
> **A – Gregory Silvers – COO, Secretary, Vice President & General Counsel>:** Tony, the other thing I'd tell you is there's a comparable gaming facility in Aqueduct underway, and financing doesn't appear to be a particular problem for their project in the New York area.
>
> **Q – Anthony Paolone – JPMorgan Securities LLC>:** All right.
>
> **A – Gregory Silvers – COO, Secretary, Vice President & General Counsel>:** And the ownership is reasonably comparable. Although, it's not exactly the same. The majority owner in both cases is the same.

114.     On March 8, 2012, EPT and Empire jointly presented an overview of the master

plan for redevelopment of EPT's property to the Town of Thompson Town Board.

115.     EPT and Empire established a joint website where they describe the project as

"creat[ing] over one thousand jobs with hundreds of millions of dollars of investment."

116.     As of June 30, 2011, Empire's net worth was less than $25 million and its cash was less than $16 million, far short of the "hundreds of millions of dollars" needed to make Empire's proposal for development of a racino at the Concord Site viable.

117.     Empire's financing would most likely come from Empire's "silent" third party, Genting USA, or Empire's and Genting USA's mutual parent, Kien Huat, which have publicly fought to avoid any new gaming competition to their subsidiaries' racinos.

118.     The Exclusivity Agreement, the master development term sheet and the press releases jointly issued by Entertainment Properties and Empire, were intended to and did obstruct and delay Plaintiffs' ability to build the New Concord Casino Resort that would compete with Monticello Casino and Resort World Casino.

119.     Since October 2011, the EPT Defendants have continued to disavow their obligations to Plaintiffs under the Restrictive Covenant and the terms of the CDA, citing their agreement with Empire to not cooperate with Plaintiffs.

120.     In an anticipatory breach of the CDA, EPT Concord II disavowed its obligations under the CDA to provide Plaintiff Associates with the ground lease for the Racino Tract for a $200,000 annual rental beginning in June 2012, making extra-contractual demands on Plaintiff Associates to deliver certain agreements and concessions to which EPT Concord II is otherwise not entitled, including, but not limited to, a release of the Restrictive Covenant, assignment of certain master development rights held by Associates and a commitment that Associates will cooperate with EPT Concord II in connection with any request for rezoning or variances, requests to amend, resubmit or modify its own development plans to permit Empire and Entertainment Properties to proceed with their development of an Empire racino on the Resort Property.

121.     Not until the deadline on June 19, 2012, and only after this lawsuit was commenced, did the EPT Defendants finally acknowledge they had no alternative but to lease the Racino Tract to Plaintiffs for $200,000 per year.

122.     Empire further attempted to impede completion of the New Concord Casino Resort by informing both Plaintiffs (by letter dated September 23, 2011 from EPT's counsel) and the Town of Thompson Town Board (by letters dated September 20, 2011 and June 27, 2011 from Empire's counsel, and September 23, 2011 from EPT's counsel) that owners of any horses racing at the proposed harness racing track at the Concord Site would not be permitted to board their horses at the overnight paddocks at Monticello Raceway, or utilize Monticello Raceway's Barn and Training facilities.

123.     These exclusions and public statements were made with the intent of making the New Concord Casino Resort appear economically and environmentally unviable and as a threat to the horsemen who depend upon the barns at Monticello Raceway to board their horses to refuse to deal with Plaintiffs.

**The Sham Article 78 Proceeding**

124.     On or about October 4, 2011, two weeks before Plaintiffs were to commence their financing "road show" for the $395 million Jefferies bond offering, Empire filed an Article 78 proceeding in New York State Supreme Court, Sullivan County, challenging the Town Board's routine extension of two building permits (the "Building Permits") previously issued to Plaintiff Associates by the Building Inspector of the Town of Thompson.

125.     The Article 78 proceeding was brought against the Town of Thompson, Associates, and—collusively—"against" EPT Concord II.  EPT Concord II did not oppose the

action, but in fact was excused from answering the Petition by Empire, further evidence of the conspiracy between Defendants.

126.    In the Article 78 proceeding, Empire asserted unfounded claims that the Building Permits extensions were in violation of SEQRA and local law.

127.    The claims asserted by Empire in its Article 78 proceeding were not objectively reasonable, as the renewal and/or extension of a building permit is not subject to a "hard look" review under SEQRA, and because the Building Permits were duly extended in accordance with the applicable laws, rules and/or regulations, which undeniably authorized the Town Board to grant an extension of the Building Permits.

128.    Further, other than the economic threat to its monopoly over gaming and racing in the Catskills region, Empire had not suffered and was not in danger of suffering an injury of any kind stemming from the Town's extending the Building Permits, and thus lacked standing to bring the action.  Unsurprisingly, the proceeding was dismissed on February 22, 2012 on the grounds of lack of standing and lack of merit.

129.    The Article 78 proceeding was a frivolous lawsuit, timed specifically to sabotage Plaintiffs' October 2011 Jefferies bond offering, New York Racing license approval efforts, and local development approval efforts, and initiated solely with the intent of stifling competition, specifically aimed at preventing Plaintiffs from proceeding with the development of the New Concord Casino Resort through the abuse of process, not with any belief in the legal merits of such action.

**Empire's Local Monopoly**

130.    Plaintiffs' proposed racino at the Concord Property would be New York's first casino connected to a high end tourism resort, where visitors could come to play, stay and

engage in a multitude of tourism-related activities, and not just gamble and go home.

131.    Defendant Empire's Monticello Casino is the only harness track and racino in the Catskills.  The nearest racino to Monticello Casino is more than 80 miles away in Pennsylvania. Monticello Casino states in its public SEC filing that it "does not compete directly with other harness racing tracks in New York State for live racing patrons."

132.    The nearest resort casinos that offer entertainment and dining facilities that are comparable to those planned for the New Concord Casino Resort are more than 150 miles away at Foxwoods and Mohegan Sun in Connecticut, which are also more than 125 miles from New York City.

133.    Empire's position as the only operator of casino gaming operations located in the Catskills region enables it to remain "the only game in town" for local consumers, including Catskill region tourists, horsemen and other suppliers of racing and gaming products and services, without the pressures supplied by local competition to improve the quality or prices of the products and services it offers.

134.    As "the only game in town," Empire is able to operate profitably despite running a run-down racino where more people line up in the casino to play Tic-Tac-Toe against "Roxy" the chicken than patronize the track, and the harness racing purses are roughly 20% of those offered at Yonkers.

135.    On June 13, 2011, *The Times Union* quoted Empire's spokesman, Joseph DePlasco, succinctly stating that Empire's unabashed monopolistic goal of preventing Plaintiffs from constructing a competing racino in the Catskills region: "Is there anyone who thinks it makes sense to put another racetrack within three miles of an existing racetrack?"

136.     In a June 16, 2011 letter to Plaintiffs' counsel , Empire's counsel admitted that Empire will "take all necessary and appropriate steps" to prevent Plaintiff Raceway Corp. from obtaining the eighth and final available harness racing license, a prerequisite to building the New Concord Casino Resort.

137.     Having two separately owned racinos instead of one racino in the Catskills region would cause growth and promote competition.  Consumers and horsemen would have greater choice and more bargaining power for a variety of products and services including (without limitation) transportation, lodging, parking, food, gaming play incentives, paddock facilities, barn rents, and race purses, as the two racinos would compete with each other for consumers and horsemen.

138.     The New Concord Casino Resort is the only potentially viable competitor for Empire in the Catskills region, and the Concord Site is the only viable location for Plaintiffs to build a racino that could compete effectively with Empire's Monticello Casino, due to Plaintiffs' existing property interests there and the limitation of the New York tax advantage that is peculiar to the site.

139.     However, Kien Huat, the controlling owner of Empire has no interest in the growth of gaming or racing in the Catskills region if that would mean Empire would need to compete for its share of that market, preferring its monopoly over racing and gaming in a limited Catskills region economy to a duopoly share of a larger Catskills region racing and gaming market where it would face competition for consumers and horsemen, notwithstanding the opportunity for greater profits therefrom.

140.     Genting USA, the "silent third party" in the EPT-Empire conspiracy, is also opposed to the development of the New Concord Casino Resort or any other new competition in

New York State within driving distance of Resorts World Casino, which generated $57.5 million in slot machine revenue in May 2012, more than any other casino in the United States.

141.    The Genting Defendants have publicly opposed any sort of new gaming competition to its Resorts World Casino, whether in the form of a casino on Long Island, the Catskills region or elsewhere.

142.    In June of 2012, it was widely reported that Genting USA's demands to have their Resorts World Casino be the sole casino in New York City led to a breakdown in negotiations with the state over a $4 billion proposal to build the country's largest convention center with an attached hotel as part of the Resorts World Casino complex.

## RELEVANT MARKET

143.    The New Concord Casino Resort would compete with other reasonably accessible casinos/racinos for legal casino gaming business (the "Casino Gaming Market").

144.    The New Concord Casino Resort would compete with other reasonably accessible casino hotel and resort facilities that compete for tourism patrons (the "Casino Resort Tourism Market").

145.    Casino hotels are unique properties for purposes of evaluating their risks and benefits to competition, as the Department of Justice has recognized in Hart-Scott-Rodino regulations governing mergers under federal antitrust law.  *See, e.g.,* 16 C.F.R. § 802.2(e).

146.    The New Concord Casino Resort would compete with Monticello Raceway for horsemen, gamblers and gaming products and services ("Racing/Gaming Market").

147.    The New Concord Casino Resort's "catchment area" (an economic term referring to the county where the casino property is located along with the surrounding areas in which it generates the most concentrated economic activity) would be the area within a radius of

approximately 100 miles from the Town of Thompson, with a total population of more than 18-20 million people, of which almost 90% reside in the New York, NY metropolitan area, the number one population base in the United States.  That catchment area is known as the New York-Northeastern New Jersey-Long Island, NY-NJ-PA Metropolitan Statistical Area (the "NY MSA"), a 23 county area as classified by the U.S. Office of Management and Budget as part of the 2010 Census.

148.    The New Concord Casino Resort would compete for gamblers and vacation tourists with the Resorts World Casino and other casinos/racinos, race tracks and casino resorts that draw patrons from the NY MSA, including Monticello Casino.

149.    There are five casinos within a 100-mile radius of Plaintiffs' proposed New Concord Casino Resort, including casinos located in New York and Northeast Pennsylvania. While all of these casinos have slot machines, none offers a fully integrated casino-hotel/resort experience.

150.    The NY MSA is the relevant geographic area in which Defendants' anticompetitive activities to obstruct the development of the New Concord Casino Resort has had and will continue to have anticompetitive effects upon consumers in the Casino Gaming Market and the Casino Resort Gaming Market.

151.    There are significantly high barriers to entry to the Casino Gaming Market and the Casino Resort Tourism Market, principally attributable to (a) New York law limiting issuance of a racino license to the operator of a licensed harness racing track; and (b) the availability of only one remaining government license to operate a new harness race track in New York, which had been earmarked for issuance to Plaintiff Raceway Corp. to establish and operate a harness race track at the Concord Site.

152.    The relevant geographic sub-market for purposes of Empire's local monopoly over the Racing/Gaming Market is the tourism destination area known as the "Catskills region" of New York, located within Sullivan, Delaware, Greene and Ulster Counties.

153.    The New York State Department of Economic Development divides New York State into eleven distinct economic regions, one of which is the Catskills region.

154.    The Catskills region, has a long and storied history as a tourism and vacation destination, with popular natural resources for water sports, mountain sports, hunting and golf. In 2010, tourism in the Catskills region was a nearly $1 billion industry, supporting 16,666 jobs. In addition to the millions of "day-trippers" who visit the Catskills region for a day of recreation, the Catskills region attracts a distinct subset of tourists, "overnight visitors."  In 2009, Sullivan County alone attracted approximately 3,525,000 overnight visitors.

155.    In its most recent quarterly report on Form 10-Q for the quarter ended March 31, 2012, filed with the Securities and Exchange Commission, Defendant Empire describes its Monticello Racino as "located in the Catskills region, which has historically been a resort area."

156.    In its March 8, 2012 presentation to the Town of Thompson Town Board, EPT and Empire described their master plan for redevelopment of the Concord Property as a "significant opportunity to revitalize the Catskills region."  The presentation included references to the unique "regional character" of the region and the historic significance of the Concord Hotel.  Tim Lies, a project executive for EPT, has stated the company's vision would be "respectful of the grand tradition of the Catskill resorts."

157.    Plaintiffs' New Concord Casino Resort would cater to both "day-trippers" residing in or close to the Catskills region and the traditional overnight tourists who currently account for 3.5 million visits annually to the Catskills region, who comprise Monticello Casino's

current consumer base, and to new overnight visitors principally from within an approximately 100 mile radius who would visit and stay at or near the New Concord Casino Resort as a gaming and resort vacation destination, like the resort casinos in Las Vegas or Atlantic City.

158.   The Defendants' acts to obstruct Plaintiffs' development of the New Concord Casino Resort have and will continue to have anticompetitive effects on consumers in the Racing/Gaming Market in the Catskills region, and the Casino Resort Tourism and Casino Gaming Markets in the NY MSA.

## INTERSTATE TRADE AND COMMERCE

159.   Defendants' unlawful activities as described herein occurred in, and have directly, substantially, and foreseeably affected and continue to affect, interstate commerce.

160.   A January 2012 study commissioned by the New York Gaming Association estimated that by the end of 2011, "out-of-state visitor spending" at New York's racinos exceeded $93 million annually.

161.   Monticello Casino serves tourists and harness racing professionals from various states, and the New Concord Casino Resort would serve gamers, tourists and racing professionals from the NY MSA, which extends into Connecticut and Pennsylvania.

162.   Plaintiffs' October 2011 planned $395 million Jefferies bond offering that Defendants' illegal conspiracy scuttled was in the process of being marketed to investors throughout the United States through the instrumentalities of interstate commerce.  Defendants interfered with that financing through the use of facilities of interstate commerce, including publication of press releases through wire services and the internet.

163.   Horsemen from out of state race and train at Monticello Raceway and would race and train at the Concord harness track to be built at the New Concord Casino Resort.

164.     Races at Monticello Raceway are simulcast through facilities of interstate commerce so that the races may be viewed outside New York and legal parimutuel wagering occurs outside New York on the outcome of such races.  Similar simulcasting of Concord harness track racing would occur.

## INJURY TO CONSUMER WELFARE AND COMPETITION

165.     Defendants' anticompetitive scheme has had and continues to have the direct, intended and reasonably foreseeable effect of reducing competition in the Catskills region for gaming and racing products and services and related lodging, entertainment and resort tourism products and services.  Defendants' anticompetitive scheme reduces consumer and public welfare in that:

(a) actual and potential competition in the markets for racing (including parimutuel wagering), gaming and related tourism amenities in the Catskills region has been, and will continue to be, limited, reduced, restrained, suppressed, and substantially foreclosed;

(b) instead of free, open, and competitive markets for racing and gaming, Empire's local monopoly position has been  maintained and insulated against viable competition and Genting USA's market share at Resorts World Casino remains insulated against competition from the New Concord Casino Resort as a destination gaming resort that would draw patrons away;

(c) Plaintiffs have been and will be effectively foreclosed from competing with Empire or the Empire/Entertainment Properties joint venture in any meaningful way, reducing options for consumers of racing, gaming and related tourism products and services in the Catskills region or competing

with Genting USA within the NY MSA area, and preventing the expansion of employment at the racino, racetrack, hotel, restaurants and other amenities that would be developed around the "anchor" of Plaintiffs' proposed racino at the Concord Site;

(d) as a result, consumers of such products and services pay and will continue to pay higher prices and receive service and amenities inferior to those they could receive at the New Concord Casino Resort, or be deprived of similar benefits that Empire and Genting USA would be compelled by such competition to offer at the Monticello Casino or Resorts World Casino in the face of competition from Plaintiffs;

(e) others such as track, casino and hotel workers and vendors, and horse racing professionals will be detrimentally impacted by the lack of competition to Empire's monopoly and Empire/Entertainment Properties' monopolistic joint venture, with substantially less bargaining power vis-à-vis prices and quality of products and services bought from or sold to Defendants; and

(f) Plaintiffs' have been and will continue to be injured directly in their business and property as a result of Defendants' foregoing anti-competitive actions to limit competition.

## COUNT I
### (Against All Defendants)
### (Unlawful Restraint of Trade-Sherman Act Section 1)

166.    Plaintiffs hereby re-allege and incorporate by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

167.    Defendants' foregoing combination, agreements and conspiracy restrains trade by impeding and delaying Plaintiffs' ability to construct the New Concord Casino Resort.  The

combination, agreements and conspiracy were effected through an unlawful group boycott of Plaintiffs, an unlawful refusal to deal with Plaintiffs, and a denial of essential facilities to Plaintiffs, all with the purpose and effect of impeding and delaying Plaintiffs' New Concord Casino Resort for the purpose of preventing competition to Defendants' Empire's Monticello Casino and Defendant Genting USA's Resort World Casino.

168.    The restraints of trade effected by Defendants' conspiracy serve no legal business reason and have no pro-competitive benefits.

169.    The conspiracy by and between Defendants has had and will have the effects of suppressing competition and such effects are not *de minimis* or minute but substantial and significant.

170.    The combination, agreements and conspiracy among Defendants to inhibit competition has adversely affected and will adversely affect interstate commerce.

171.    As a direct result of this unlawful conspiracy and Defendants' anticompetitive acts in furtherance of their conspiracy, Plaintiffs have been injured and will continue to be injured in their business by their inability to compete effectively, and by a loss of actual and potential business, and by the loss of profits from all the above.

172.    Plaintiffs' and consumers' injuries are the type of injuries the antitrust laws were designed to prevent, and flow from that which make Defendants' conduct unlawful.

173.    Defendants' antitrust violations threaten continuing and irreparable loss and injury to Plaintiffs and consumers.

## COUNT II
### (Against All Defendants)
### (Conspiracy to Monopolize-Sherman Act Section 2)

174.    Plaintiffs hereby re-allege and incorporate by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

175.    Defendants, by their action identified above, have willfully, knowingly, intentionally, and with specific intent to do so, conspired and continue to conspire to preserve and maintain for Defendant Empire its monopoly over the Racing/Gaming Market in the Catskills region in violation of 15 U.S.C. § 2.

176.    In furtherance of this conspiracy, the Defendants have willfully, intentionally, and with specific intent to do so conspired to preclude Plaintiffs from competing with Empire in the Catskills region, by refusing to deal with Plaintiffs and denying Plaintiffs the use of the Racino Tract, a facility that is essential for Empire's only viable would-be competitor, Plaintiffs, to establish the competing New Concord Casino Resort.

177.    The natural and probable consequences of Defendants' conspiracy and Defendants' acts in furtherance of this conspiracy were to suppress, reduce, and eliminate competition in that relevant market, consequences that were plainly intended and foreseeable by Defendants.

178.    Defendants' conspiracy to monopolize for Empire the Racing/Gaming Market in the Catskills region, has affected and continues to adversely affect interstate commerce.

179.    The Defendants' conspiracy has no legal business purpose and exists solely to insulate from competition from Plaintiffs, Empire's gaming and racing monopoly in the Catskills region and ultimately Kien Huat's other gaming interests in the NY MSA.

180.     The conspiracy has caused, and will continue to cause, substantial adverse effects in the Racing/Gaming Market in the Catskills region and in the Casino Gaming and Casino Resort Tourism Markets that draw from the NY MSA.  It will suppress, reduce, and eliminate such competition, and thus enable Defendants to charge supra-competitive prices in these markets, and eliminates or reduces options for consumers, horsemen and employees.

181.     As a direct result of this unlawful conspiracy Plaintiffs have been injured and will continue to be injured in their business and property by the resulting preclusion of their inability to compete effectively, their loss of investment, loss of opportunity, and loss of profit.

182.     Plaintiffs', consumers' and horsemen's injuries are the type of injuries the antitrust laws were designed to prevent, and flow from that which make Defendants' conduct unlawful.

183.     Defendants' antitrust violations have caused and will cause continuing loss and injury to Plaintiffs, consumers, horsemen and other participants in the relevant market economies.

## COUNT III
**(Against Defendants Empire Resorts, Inc. and Monticello Raceway Management Inc.)**
**(Unlawful Monopolization – Sherman Act Section 2)**

184.     Plaintiffs hereby re-allege and incorporate by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

185.     By their foregoing acts, Defendant Empire has perpetuated its monopoly in the Racing/Gaming Market in the Catskills region in violation of 15 U.S.C. § 2.

186.     Empire's monopolization of the Racing/Gaming Market in the Catskills region has affected and continues to affect interstate commerce adversely.

187.     Empire's monopoly has caused, and will continue to cause, substantial adverse effects in the markets for racing and wagering in the Catskills region.  It suppresses, reduces, and eliminates competition, and thus enables Empire to charge, and consumers and horsemen to pay, supra-competitive prices for racing and gaming products and services.

188.     As a direct result of Empire's illegally maintained monopoly, Plaintiffs have been injured and will continue to be injured in their business and property by their inability to compete effectively, and by a loss of actual and potential business, and by the loss of invested capital, loss of opportunity and lost profits from all the above.

189.     Plaintiffs' and consumers' injuries are the type of injuries the antitrust laws were designed to prevent, and flow from that which make Empire's conduct unlawful.

## COUNT IV
### (Against the Empire Defendants and the Genting Defendants)
### (Tortious Interference With Contract)

190.     Plaintiffs hereby re-allege and incorporate by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

191.     As set forth herein above, at all relevant times there existed contracts between Associates and the EPT Defendants.

192.     Defendants Empire, Genting USA and Kien Huat knew about the existence of the agreements between Associates and the EPT Defendants.

193.     As detailed herein more fully above, these Defendants willfully and intentionally interfered with the EPT Defendants' performance of their obligations and otherwise induced EPT Defendants induced to breach or repudiate their obligations under the agreements.

194.     The EPT Defendants have breached one or more of their obligations under the terms of the agreements.

195.    As a direct and proximate result of the foregoing, Associates has been made to suffer damages in an amount to be determined at trial but believed to be in excess of $500 million, together with interest.

196.    By reason of the foregoing, Associates demands judgment against Defendants Empire, Genting USA and Kien Huat in an amount to be determined at trial, but not less than $500 million, together with interest.

## COUNT V
### (Against the Empire Defendants, Genting Defendants and Kien Huat)
### (Tortious Interference with Business Relations)

197.    Plaintiffs hereby re-allege and incorporate by reference the allegations contained in all preceding paragraphs as if fully set forth herein.

198.    At all relevant times, Plaintiffs were in an existing and a prospective business relationship with the EPT Defendants.

199.    Defendants Empire, Genting USA and Kien Huat knew about, and intentionally and maliciously interfered with, Plaintiffs' business relations with the EPT Defendants, by use of dishonest, unfair, and/or improper or illegal means, and were otherwise taken without reasonable justification and with the purpose and intent of causing harm to Plaintiffs.

200.    By virtue of the conduct alleged, Defendants Empire, Genting USA and Kien Huat actually interfered with Plaintiffs' ability to obtain the benefits of its business relations with EPT Defendants, to the detriment of Plaintiffs.

201.    As a direct and proximate result of Defendants Empire's, Genting USA's and Kien Huat's conduct, Plaintiffs have been made to suffer injury to their business relationship with EPT Defendants, and have thereby been made to suffer actual and special damages in an amount to be determined at trial, but believed to be not less than $500,000,000.

202.    By reason of the foregoing, Plaintiffs demands Judgment against Defendants Empire, Genting USA and Kien Huat in an amount to be determined at trial, but not less than $500,000,000, together with interest.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiffs demand the following relief:

a)  an injunction against Defendants ordering them to cease and desist from their unlawful conspiracy in restraint of trade in the Casino Gaming Market and Casino Resort Tourism Market in the NY MSA, conspiracy to monopolize the Racing/Gaming Market in the Catskills region, and attempted monopolization of the Racing/Gaming Market in the Catskills region;

b)  an award of the actual damages that Plaintiffs have sustained due to the Defendants' unlawful and anticompetitive conduct as alleged herein in an amount to be determined at trial which Plaintiffs estimate to be not less than $500 million;

c)  an award trebling such damages to an amount not less than $1.5 billion as mandated by law;

d)  damages in an amount to be determined at trial against the Empire Defendants and the Genting Defendants for tortious interference with Plaintiffs' contracts and business relations;

e)  punitive damages against the Empire and Genting Defendants on Counts IV and V;

f)  pre-judgment interest and  post-judgment interest from the date of entry until the date of satisfaction at the highest rates allowable by law;

g)  an award of reasonable attorneys' fees and costs incurred by Plaintiffs in this

action; and

h)  such additional relief, legal or equitable, to which plaintiff may be entitled.

### JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Dated: White Plains, NY
       June 25, 2012

Respectfully Submitted,

LOWEY DANNENBERG COHEN & HART, P.C.

By: _____
       Richard W. Cohen
       Uriel Rabinovitz
One North Broadway, Fifth Floor
White Plains, New York 10601
Tel:    (914) 997-0500
Fax:    (914) 997-0035
E-Mail: rcohen@lowey.com

DELBELLO DONNELLAN WEINGARTEN WISE &
WIEDERKEHR, LLP
Alfred E. Donnellan
Michael J. Schwartz
One North Lexington Avenue
White Plains, NY 10601
Telephone: (914) 681-0200