UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
:
CONCORD ASSOCIATES, L.P.,                                    :
CONCORD RACEWAY CORPORATION,                                 :
CONCORD KIAMESHA CASINO, LLC,                                :
CONCORD KIAMESHA CAPITAL CORP.,                              :
CONCORD RESORT, LLC,                                         :
CONCORD KIAMESHA, LLC, and                                   :
CONCORD KIAMESHA HOTEL, LLC,                                 :
:
                              Plaintiffs,                    :       **<u>OPINION & ORDER</u>**
:
       - against -                                          :
:                       12 Civ. 1667 (ER)
ENTERTAINMENT PROPERTIES TRUST,                              :
EPT CONCORD, LLC, EPT CONCORD II, LLC,                       :
EMPIRE RESORTS, INC., MONTICELLO                             :
RACEWAY MANAGEMENT, INC.,                                    :
KIEN HUAT REALTY III LIMITED, GENTING                        :
NEW YORK LLC, and JOHN DOES 1 TO 5,                          :
:
                              Defendants.                    :
:
------------------------------------------------------------x

<u>Appearances:</u>

James I. Serota
Scott A. Martin
Roy Taub
Greenberg Traurig LLP
New York, New York
*Attorneys for Plaintiffs*

Moses Silverman
Joshua D. Kaye
Paul, Weiss, Rifkind, Wharton & Garrison LLP
New York, New York
*Attorneys for Defendants Empire Resorts Inc. and Monticello Raceway Management, Inc.*

Y. David Scharf
Kristin T. Roy
Gayle E. Pollack
Morrison Cohen LLP
New York, New York

*Attorneys for Defendants Entertainment Properties Trust, EPT Concord, LLC, and EPT Concord II, LLC*

Howard S. Zelbo
Matthew M. Bunda
Leah Brannon
Cleary Gottlieb Steen & Hamilton LLP
New York, New York and Washington, D.C.
*Attorneys for Defendants Kien Huat Realty III Limited and Genting New York LLC*

RAMOS, D.J.:

This litigation concerns an alleged conspiracy to monopolize and monopolization of the racing and casino gaming industry in the Catskills region of New York State. The Plaintiffs are entities who collectively are attempting to build a casino-resort complex which would offer a luxury hotel, name entertainment and championship golf in addition to harness racing and casino gaming. Plaintiffs assert three antitrust claims against the Defendants pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15: unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; and monopolization and conspiracy to monopolize in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Plaintiffs also assert state law claims for tortious interference with contract and tortious interference with business relations.

Currently pending are two motions to dismiss the Amended Complaint, one filed by Defendants Empire Resorts Inc., Monticello Raceway Management, Inc., Entertainment Properties Trust, EPT Concord, LLC, and EPT Concord II, LLC, Doc. 41, and the other filed by Defendants Kien Huat Realty III Limited and Genting New York, LLC, Doc. 44, who also join in the first motion. For the reasons set forth below, both motions are GRANTED.

2

## I. Background

### A. The Parties

1. <u>Plaintiffs</u>

Plaintiffs Concord Associates, L.P. ("Concord Associates"), Concord Raceway Corporation ("Concord Raceway"), Concord Kiamesha Casino, LLC ("Concord Casino"), Concord Kiamesha Capital Corporation ("Concord Capital"), Concord Resort, LLC ("Concord Resort"), Concord Kiamesha, LLC ("Concord Kiamesha") and Concord Kiamesha Hotel, LLC ("Concord Hotel") (collectively "Plaintiffs") are limited partnerships, corporations, and limited liability companies organized and existing under the laws of the State of New York and the State of Delaware, and authorized to do business in the State of New York. Am. Compl. ¶¶ 30-32, Doc. 26.

2. <u>Entertainment Properties Defendants</u>[1]

Defendant Entertainment Properties Trust ("EPT") is a Maryland real estate investment trust, and Defendants EPT Concord, LLC ("EPT Concord") and EPT Concord II, LLC ("EPT Concord II") are limited liability companies organized and existing under the laws of the State of Delaware and authorized to do business in the State of New York. *Id.* ¶¶ 33-34. Plaintiffs refer to EPT, EPT Concord and EPT Concord II as "Entertainment Properties."[2] Am. Compl. at 1.

---

[1] Plaintiffs in their Amended Complaint use group pleading to discuss the allegations against the various defendants, i.e., they utilize one name to collectively refer to several different defendants. This practice has made it exceedingly difficult to discern which individual defendants are alleged to have participated in the events in question and proves fatal to Plaintiffs' claims regarding the group of defendants referred to as the "Genting Defendants." *See infra* Section II(C). However, in setting forth the statement of facts, the Court refers to individual defendants and to groups of individual defendants according to the terminology used by Plaintiffs in the Amended Complaint, except where otherwise noted.

[2] Plaintiffs also refer to EPT, EPT Concord and EPT Concord II as the "EPT Defendants." Am. Compl. at 1. However, for the sake of clarity, the Court will only use the term "Entertainment Properties" when discussing this set of defendants. Additionally, in Paragraph 95 of the Amended Complaint, Plaintiffs refer to "Entertainment Properties" as "Defendant," suggesting that Entertainment Properties refers only to one defendant; however, the

3

### 3. Empire Defendants

Defendants Empire Resorts, Inc. and Monticello Raceway Management, Inc. ("Monticello") are corporations organized and existing under the laws of the State of Delaware, and with a principal place of business in Monticello, New York.  Monticello is a wholly-owned subsidiary of Empire Resorts, Inc.  *Id.* ¶ 35.  Plaintiffs refer to Empire Resorts, Inc. as "Empire," and *also* refer to Empire and Monticello collectively as "Empire."  Am. Compl. at 1-2.[3]

### 4. Genting Defendants

Defendant Genting New York, LLC ("Genting NY")[4] is a limited liability company organized and existing under the laws of the State of Delaware, and authorized to do business in the State of New York.  Genting NY owns and operates Resorts World Casino, a racing and casino gaming facility located in Jamaica, New York.  *Id.* ¶¶ 16, 40, 89-90.

Non-defendant Genting Berhad, located in Malaysia, is one of the largest gaming companies in the world and is the parent and holding company for subsidiaries and affiliates operating under the name "Genting Group."  *Id.* ¶¶ 17, 38.  Genting Berhad owns 49.3% of subsidiary non-defendant Genting Malaysia Berhad, located in Malaysia.  *Id.* ¶ 39.  Defendant Genting NY is a wholly-owned subsidiary of Genting Malaysia Berhad.  *Id.* ¶ 40.

Non-defendant Kien Huat Realty Sdn Bhd, located in Malaysia, is an affiliate of Defendant Kien Huat Realty III, Limited ("Kien Huat Realty") and it owns 39.6% of and

---

Court will construe the use of the singular to be a typographical error and treat this reference as applying to the group of defendants previously described as "Entertainment Properties."  *Id.* ¶ 95.

[3] When referring to "Empire" in the Amended Complaint, Plaintiffs do not adequately specify whether they are referring to Empire Resorts, Inc. alone or to both Empire Resorts, Inc. and Monticello. *See e.g.*, Am. Compl. ¶¶ 11, 13, 18, 20-22, 23-25, 35, 85-89, 94-99, 122, 124, 130-39.  In the interest of clarity, and because it does not change the legal analysis, the Court will interpret references to "Empire" in the Amended Complaint, whether stating Defendant Empire or the Empire Defendants, as referring to both Empire Resorts, Inc. and Monticello.

[4] Plaintiffs in their Amended Complaint refer to Genting New York, LLC as "Genting USA."  Am. Compl. ¶ 40.

4

"exercises operating control" over non-defendant Genting Berhad and its subsidiaries. *Id.* ¶¶ 18, 37.

Defendant Kien Huat Realty is an Isle of Man corporation headquartered in Malaysia. Its principal business is to act as a holding company for investments held under a trust for the benefit of Lim Kok Thay, a citizen of Malaysia, and certain other members of his family. *Id.* ¶ 36. Lim Kok Thay is the Chairman and Chief Executive of non-defendants Genting Berhad and Genting Malaysia Berhad. *Id.* ¶ 41.

Kien Huat Realty, along with Fook Yew Au, an individual who is also known as Colin Au ("Colin Au"), an executive of a number of Kien Huat Realty affiliates, acquired a majority interest in Empire in November 2009. *Id.* ¶¶ 14, 18, 36, 88. According to Plaintiffs, Kien Huat Realty "exercises operating control over both Empire and Genting [NY], through its ownership interests and the executive control exercised by Colin Au over both companies." *Id.* ¶ 36.

Defendants John Does 1-5 are the jural entities, whose identities are presently unknown, that serve as corporate agents and holding companies through which Lim Kok Thay (or trusts for his benefit) controls Empire and Genting NY. *Id.* ¶ 41.

Plaintiffs refer to Kien Huat Realty and the John Doe entities 1-5 as "Kien Huat."[5] Together, Kien Huat and Genting NY are referred to as the "Genting Defendants." Am. Compl. at 2.

### B. Gaming in New York State

The New York State Department of Racing and Wagering ("NYS Racing") has

---

[5] Although Plaintiffs define "Kien Huat" to include six defendants, they seem to use "Kien Huat Realty" and "Kien Huat" interchangeably. *See* Am. Compl. ¶ 36. Moreover, in their opposition to the Genting Defendants' motion to dismiss, Plaintiffs define "Kien Huat" to only include Kien Huat Realty and not the John Doe entities 1-5 as they do in the Amended Complaint. *See* Pls.' Opp. Mem. to Genting Defendants ("Pls.' Opp. Mem. to Genting") 1, Doc. 50.

authorized a total of eight licenses to operate harness race tracks in New York.  Seven of the licenses have been issued to the seven harness tracks currently operating in New York State.  *Id.* ¶ 44.  The eighth, and final, license has been "earmarked" for issuance to Plaintiff Concord Raceway to establish and operate a harness race track at the site of the former Concord Resort Hotel, which is located in the Catskills Mountains of New York, in the Town of Thompson, Sullivan County.  *See id.* ¶¶ 44, 48, 56.

The Concord Resort Hotel was once a world-famous vacation destination for visitors to the Catskills Mountains until its bankruptcy and closing in 1998.  *Id.* ¶¶ 48, 51.  The area currently at issue is referred to by Plaintiffs as the "Concord Site."  The Concord Site is made up of two adjoining parcels.  The first, consisting of approximately 1,500 acres, houses two golf courses, residential properties and vacant land, and is referred to as the "Resort Property."  The other, consisting of approximately 140 acres, is the site of the former Concord Resort Hotel and is referred to as the "Casino Property."  *Id.* ¶ 56.

In 2001, New York enacted legislation authorizing the issuance of licenses to operate video lottery terminals ("VLTs") at licensed harness race tracks and thoroughbred race tracks in the State.  VLTs are gaming machines, similar in appearance to casino slot machines.  In 2009, New York State Lottery authorized the tracks to add electronic table games ("ETGs").  *Id.* ¶ 42. ETGs simulate table games, like roulette, blackjack and craps.  Enterprises that offer both racing and casino gaming are called "racinos."  *Id.* ¶ 8.  Since 2004, all seven of New York's harness race tracks, and two of its thoroughbred tracks, have opened racinos offering VLTs and ETG gaming.  *Id.* ¶ 43.

### C. Plaintiffs' Efforts to Redevelop the Concord Site

In 1999, Plaintiff Concord Associates, headed by Louis R. Capelli ("Capelli"), a real estate developer, bought the Concord Site from the bankruptcy estate. *Id.* ¶ 52. Since purchasing the property, Capelli has invested more than $100 million toward development of the New Concord Casino Resort ("New Concord Casino Resort"), which is projected to be a high end tourism resort, offering a luxury hotel, name entertainment, championship golf and legal gaming. *Id.* ¶¶ 1, 55, 130. Under New York law, Plaintiffs must operate a race track in order to offer casino gaming. *Id.* ¶ 8; *see* Transcript of Oral Argument on May 8, 2013 ("Tr.") 12:7-19.

In furtherance of their development efforts, Plaintiffs have: (a) conducted an "exhaustive" environmental review, *id.* ¶ 58; (b) obtained necessary approvals and permits for redevelopment of the Concord Site, including approvals from the Town of Thompson Town Board and the Town's Planning Board, *id.* ¶¶ 58-61; and (c) obtained preliminary approval from NYS Racing and from the Division of Lottery in the form of comfort letters for the eighth and final racino license to operate a harness race track. *Id.* ¶ 64. In addition, Plaintiffs have "performed substantial work at the project site . . . including . . . demolition, pre-construction work, substantial environmental remediation work, and foundation work." *Id.* ¶ 62.

### D. Transfer of the Resort Property to EPT Concord II & Related Agreements

On June 18, 2010, as part of a settlement intended to resolve several lawsuits between Defendant EPT and Plaintiff Concord Associates, and other Capelli affiliates, Plaintiffs transferred the 1,500 acre Resort Property to Defendant EPT Concord II. *Id.* ¶¶ 52, 66. Pursuant to the terms of the settlement, Plaintiff Concord Associates retained the 140 acre Casino Property. *Id.* ¶ 67. However, the agreement to transfer the Resort Property was subject to

certain rights in that land that the parties agreed would be reserved for Plaintiffs' exclusive use and exploitation, specifically to enable Plaintiffs to proceed with and complete development of the New Concord Casino Resort. *Id.* ¶ 68.

### 1.  Casino Development Agreement & the Racino Tract

On June 18, 2010, Plaintiffs Concord Associates, Concord Resort and Concord Kiamesha entered into a Casino Development Agreement ("CDA") with Defendant EPT Concord II. *Id.* ¶ 69. In the CDA, EPT Concord II agreed to provide Plaintiffs with, *inter alia*, certain easements, leases and other rights regarding the use and development of a hotel, a racing and gaming facility and other improvements on the Resort Property. *Id.* ¶ 70.

The agreement specifically reserved for Plaintiffs a right to lease the "Racino Tract," which is a portion of the Resort Property immediately adjacent to the Casino Property, upon which Concord Kiamesha planned to build and operate a 5/8th mile oval harness racetrack and parimutuel wagering complex. *Id.* ¶ 71. In accordance with the CDA, EPT Concord II was obligated to deliver a ground lease for the Racino Tract, for an annual rent of $1.00, within the first two years of the terms of the CDA, specifically conditioned upon Plaintiffs successfully raising up to $275 million for such purposes. *Id.* ¶ 72. The CDA further provided that, even if the financing condition was not satisfied within two years, EPT Concord II was still obligated to deliver the ground lease by June 19, 2012, for an annual rent of $200,000. *Id.* ¶ 73.

### 2.  Restrictive Covenant

EPT Concord II also executed and delivered a restrictive covenant to Plaintiffs, whereby EPT Concord II would agree that neither it nor its successors or assigns would own or operate any competing casino, racino, racing or gaming facility or any other facility offering games of

8

chance on the Resort Property.  *Id.* ¶ 75.  The restrictive covenant was recorded against the Resort Property on July 15, 2010.  *Id.* ¶ 76.

### E.  Plaintiffs' Relationship with the Empire Defendants

In 1993, the Empire Defendants became the owners and operators of the Monticello Raceway, which is located in the Catskills Mountains approximately four miles from the location of the proposed New Concord Casino Resort.  In 2004, the Monticello Raceway began offering casino gaming, and was renamed the "Monticello Casino and Raceway" ("Monticello Casino").  Since June 2004, Monticello Casino has been the only race track, casino, or racino in the Catskills region.  *Id.* ¶¶ 11-12, 131, 133.  The closest racino to Monticello Casino is more than 80 miles away in Pennsylvania, *id.* ¶ 131, and the closest harness track racino in New York State is almost 100 miles away in Yonkers.  *Id.* ¶ 12.  In its filing with the U.S. Securities & Exchange Commission, Monticello Casino stated that it "does not compete directly with other harness racing tracks in New York State for live racing patrons."  *Id.* ¶ 131.  According to Plaintiffs, Empire's position as the only operator of casino gaming in the Catskills region enables it to remain "the only game in town" for local consumers, including Catskill region tourists, horsemen and other suppliers of racing and gaming products and services.  *Id.* ¶ 133.

On March 23, 2009, Empire entered into an agreement with Concord Associates to provide management services to Concord Raceway at Plaintiffs' proposed harness track.  *Id.* ¶ 86.  Until approximately the end of 2009, the Empire Defendants cooperated with Plaintiffs' efforts to develop a harness race track on the Racino Tract.  *Id.* ¶¶ 13, 85.

Then, in November 2009, Defendant Kien Huat Realty and Colin Au acquired majority ownership of Empire.  *Id.* ¶¶ 14, 88.  Shortly thereafter, Capelli, who was then a director of

Empire, introduced Au to the operators of Aqueduct Race Track ("Aqueduct"), a thoroughbred track in Jamaica, New York, with a view to Empire operating a racino there. *Id.* ¶¶ 16, 43, 89. After the meeting, Genting NY, which Kien Huat also controls and for which Au also "serves as *de facto* CEO," acquired the rights to operate a racino at Aqueduct. *Id.* ¶ 90. In October 2011, Defendant Genting NY opened the Resorts World Casino at Aqueduct, approximately 100 miles from the site of the proposed New Concord Casino Resort. Resorts World Casino quickly became the most profitable casino, in slot machine revenue, in the United States, generating $57.5 million in May 2012 alone. *Id.* ¶ 16.

According to Plaintiffs, by the beginning of 2010, following Kien Huat Realty and Au's acquisition of majority control over Empire, and Genting NY's acquisition of the rights to operate the racino at Aqueduct, Empire's cooperation with Plaintiffs ceased. *Id.* ¶¶ 15, 94. Empire began "doing whatever it could to undermine the efforts of Plaintiffs (Empire's only viable competitor in the Catskills region and a prospective competitor to Resorts World Casino for gamblers from the New York City metropolitan area) to complete development of the New Concord Casino Resort . . . ." *Id.* ¶ 94.

Plaintiffs allege that since acquiring the racino rights at Aqueduct, "Genting [NY] has lobbied against New York providing gaming licenses anywhere within driving distance of Resorts World Casino, arguing that as a matter of business necessity, it must be permitted to operate with a geographic gaming monopoly." *Id.* ¶ 91. For example, on June 21, 2011, the *Thoroughbred Times* cited Au's objection to New York State's 2010 plan to allow an Indian casino in Sullivan County, and 2011 proposal for an Indian casino on Long Island. *Id.* ¶ 92.

10

**F. Plaintiffs' Relationship with Entertainment Properties Defendants after June 2010**

In the months following the June 18, 2010 CDA, the Entertainment Properties Defendants[6] cooperated with and facilitated Plaintiffs' efforts to develop the New Concord Casino Resort while at the same time pursuing development of their own complimentary theme park, housing, retail properties and golf course on their Resort Property. *Id.* ¶ 95. However, Entertainment Properties' conduct toward Plaintiffs changed sometime in late 2010 or early 2011, "coinciding with agreements that [they] entered into with Defendant[s] Empire after Kien Huat Realty acquired control of Empire." *Id.* ¶ 96.

Beginning in 2011, Entertainment Properties entered into "agreements, combinations and conspiracies" with the Empire Defendants and the Genting Defendants (which are both controlled by Kien Huat and Colin Au) to stop cooperating with Plaintiffs and to obstruct and delay Plaintiffs' efforts to complete development of the New Concord Casino Resort." *Id.* ¶ 19. In accordance with those agreements, Entertainment Properties stopped cooperating with Plaintiffs, repudiated their obligation under the CDA and Restrictive Covenant and attempted to obstruct Plaintiffs' efforts to fulfill their obligations under these agreements. *Id.* ¶ 20. According to Plaintiffs, "Genting [NY]'s and Kien Huat's motivations to block Plaintiffs' development are principally to prevent new competition for the Monticello Casino (a motivation they share with Empire) and Resorts World Casino." *Id.* ¶ 23.

On April 12, 2011, Defendants Entertainment Properties and Empire issued a press release announcing that they had entered into an Exclusivity Agreement to "explore the joint development of the companies' respective properties located in Sullivan County." *Id.* ¶¶ 97, 111. According to Plaintiffs, the announcement falsely stated that EPT "owns the former Concord

---

[6] *See supra* note 2.

Hotel property, 1,700 acres at the site of the former hotel . . . ," ignoring the roughly 140 acres

Casino Property which is owned by Plaintiffs.  *Id.* ¶ 97.  Since the announcement of the

Exclusivity Agreement, Entertainment Properties has refused to cooperate with Plaintiffs, citing

the agreement as a bar to cooperation.  *Id.* ¶ 100.

     Similarly, in a June 6, 2011 letter to Plaintiffs' counsel, Empire's counsel indicated that

Empire would "take all necessary and appropriate steps" to prevent Concord Raceway from

obtaining the eighth and final available harness racing license, which is a prerequisite to building

the New Concord Casino Resort.  *Id.* ¶ 136.

     On June 24, 2011, Entertainment Properties and Empire issued a second press release

announcing that they had entered into a Master Development Agreement to develop an

integrated destination resort and racino on the Resort Property.  The agreement, dated June 20,

2011, provides that Entertainment Properties and Empire agree to deal exclusively with each

other and will not solicit or accept offers from third parties "for financing, development, or

management of racing, gaming or resort facilities in Sullivan County."  *Id.* ¶¶ 98, 111.

     In a July 28, 2011 earnings conference call, David Brain, President and CEO of

Defendant EPT, acknowledged that "Genting Group" was involved in the Exclusivity Agreement

between Entertainment Properties and Empire.  Brain also acknowledged that "Genting Group"

was associated with the development of the Concord Site, as the "silent third party behind"

Empire.  *Id.* ¶ 112.  According to Plaintiffs, Empire's financing "would most likely" come from

Genting NY, or Empire and Genting NY's mutual parent, "Kien Huat."  *Id.* ¶ 117.

     On August 4, 2011, Entertainment Properties and Empire issued a third press release

announcing that they had selected a planner to create a master plan for development of the Resort

Property, which would include a racino, a hotel, two golf courses, specialty lodging and complimentary retail. *Id.* ¶¶ 99, 111. Empire has paid Entertainment Properties at least $750,000 since 2011 and has agreed to make additional payments of at least $750,000. *Id.* ¶ 24. According to Plaintiffs, "[t]he Exclusivity Agreement, the master development term sheet and the press releases jointly issued by Entertainment Properties and Empire, were intended to and did obstruct and delay Plaintiffs' ability to build the New Concord Casino Resort that would compete with Monticello Casino and Resorts World Casino." *Id.* ¶ 118.

### G. Concord Associates' Bond Offering

Jeffries & Company, Inc. ("Jeffries"), a global securities and investment banking group, agreed to manage a private placement offering to raise $395 million in debt to satisfy the CDA financing requirements and provide additional financing for the New Concord Casino Resort. *Id.* ¶ 83. From June through October 2011, Plaintiffs worked with Jeffries and other gaming experts to prepare an Offering Memorandum and related bond financing documents to raise the $395 million. *Id.* ¶ 101. In addition, Plaintiff Concord Kiamesha negotiated a $50 million loan from commercial lenders Union Labor Life Insurance Company and CIBC Incorporated to finance construction of the hotel at the New Concord Casino Resort. *Id.* ¶ 102. According to Plaintiffs, the net proceeds of their proposed $395 million bond financing and $50 million loan "would have more than satisfied the CDA financing conditions by as early as October 2011." *Id.* ¶ 103.

However, the Entertainment Properties Defendants, after weeks of reviewing Plaintiffs' proposed bond offering documents, stopped cooperating with Plaintiffs. Specifically, in October 2011, Entertainment Properties refused to issue the Racino Tract ground lease to Plaintiffs before the scheduled road show for the Jeffries bond offering. *Id.* ¶ 104. According to Plaintiffs, the

refusal was motivated by a desire to prevent them from satisfying the financing requirement for the New Concord Casino Resort under the CDA. *Id.* ¶ 105. Further, Entertainment Properties' counsel admitted to Plaintiffs' counsel that EPT would not issue the Racino Tract lease due to the existence of its Exclusivity Agreement with Empire. *Id.* ¶ 107.

Plaintiffs claim that EPT's turnaround, coupled with the April 12, June 24 and August 4, 2011 press releases, caused Jeffries to cancel the financing. *Id.* ¶ 108. Following Jeffries' cancellation, on November 10, 2011, NYS Racing withdrew its comfort letter, citing Plaintiffs' failure to confirm by November 7, 2011 that it could finance the racetrack. *Id.* ¶ 109.

On December 22, 2011, Defendants Empire and Entertainment Properties publicly announced that they had entered into an Option Agreement, whereby Empire agreed to pay Entertainment Properties $750,000 for an option to lease a portion of the Resort Property to pursue Empire's own racino project at the Concord Site. *Id.* ¶ 110.

**H. Procedural History**

Plaintiffs commenced this action on March 7, 2012, Doc. 1, and filed an Amended Complaint on June 27, 2012. Doc. 26. The Amended Complaint alleges five causes of action. In Count I, Plaintiffs allege that Defendants engaged in agreements and conspiratorial actions which resulted in an unlawful restraint of trade by delaying and impeding Plaintiffs' construction of the New Concord Casino Resort in violation of Section 1 of the Sherman Act. *Id.* ¶¶ 166, 173. The agreements and conspiracy were effected through a group boycott and refusal to deal with Plaintiffs and denial of essential facilities to Plaintiffs. *Id.* ¶ 167. Count II alleges that Defendants conspired to prevent Plaintiffs from competing with Empire in the Catskills Racing/Gaming Market in violation of Section 2 of the Sherman Act. *Id.* ¶ 176. According to

14

Plaintiffs, the conspiracy has caused and will continue to cause substantial adverse effects in the Catskills Racing/Gaming Market. *Id.* ¶ 180.  Count III alleges unlawful monopolization in violation of Section 2 of the Sherman Act against the Empire Defendants in the Catskills Racing/Gaming Market. *Id.* ¶ 185.  Count IV alleges tortious interference with contract against the Empire Defendants and the Genting Defendants. *Id.* ¶¶ 190-196.  Count V alleges tortious interference with business relations against the Empire Defendants, Genting Defendants and Kien Huat. *Id.* ¶¶ 197-202.

The Defendants filed their moving papers on September 25, 2012, Docs. 41, 44, Plaintiffs filed their opposition papers on October 25, 2012, Docs. 49-50, and Defendants filed their reply papers on November 8, 2012, Docs. 53-54.  On November 29, 2012, Plaintiffs requested a pre-motion conference to seek leave to file a Second Amended Complaint.  By letters dated December 4, 2012, Defendants opposed Plaintiffs' request.  On May 8, 2013, the Court held Oral Argument on the instant motions and on Plaintiffs' request to file a Second Amended Complaint. Tr. 1-148.

## II. Discussion

### A. Rule 12(b)(6) Motions to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  More specifically, the plaintiff must allege sufficient facts to show

"more than a sheer possibility that a defendant acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). However, the "flexible plausibility standard" is not a heightened pleading standard, *see In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007), and "a complaint does not need detailed factual allegations" to survive a motion to dismiss. *Twombly*, 550 U.S. at 555.

The question on a Rule 12(b)(6) motion "'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of the Plaintiff's claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)). The Court therefore must ordinarily confine itself to the four corners of the complaint and look only to the allegations contained therein. *Id.* (citation omitted). When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *See Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010) (citation omitted); *see also Twombly*, 550 U.S. at 556 ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations," and "a well-pleaded complaint may proceed even if it appears that a recovery is very remote and unlikely." (internal quotation marks and citations omitted)).

Antitrust actions are also subject to "[t]his generous approach to pleading." *In re*

*Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 416-17 (S.D.N.Y. 2003) (quoting

*Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 128 F.3d 59, 63 (2d Cir. 1997)).

Accordingly, "[t]here is no heightened pleading requirement in antitrust cases." *In re Crude Oil*

*Commodity Futures Litig.*, 913 F. Supp. 2d 41, 54 (S.D.N.Y. 2012). However, a plaintiff "must

do more than cite relevant antitrust language to state a claim for relief." *Wolf Concept S.A.R.L.*

*v. Eber Bros. Wine & Liquor Corp.*, 736 F. Supp. 2d 661, 667 (W.D.N.Y. 2010) (citing *Todd v.*

*Exxon Corp.,* 275 F.3d 191, 198 (2d Cir. 2001)). "A plaintiff must allege sufficient facts to

support a cause of action under the antitrust laws. Conclusory allegations that the defendant

violated those laws are insufficient." *Id.* at 667-68 (quoting *Kasada, Inc. v. Access Capital, Inc.,*

01 Civ. 8893 (GBD), 2004 WL 2903776, at *3 (S.D.N.Y. Dec. 14, 2004)) (internal quotation

marks omitted); *see also id.* at 668 ("[A] bare bones statement of conspiracy or of injury under

the antitrust laws without any supporting facts permits dismissal," citing *Heart Disease Research*

*Found. v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir. 1972)).

## B. Defendants Empire and Entertainment Properties' Motion to Dismiss the Amended Complaint

Plaintiffs' First, Second and Third causes of action articulate various claims under the

Sherman Act, 15 U.S.C. §§ 1 and 2. To survive a motion to dismiss an antitrust action, a

complaint must adequately:   (1) "allege an antitrust injury;" (2) "define the relevant market,"

and (3) "allege conduct in violation of the antitrust laws." *New York Medscan LLC v. New York*

*Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 145 (S.D.N.Y. 2006) (discussing allegations under

Sections 1 and 2) (citations omitted). Defendants Empire and Entertainment Properties move to

dismiss the Amended Complaint arguing, *inter alia*, that Plaintiffs have failed to allege an

antitrust injury, define a relevant market, or allege conduct in violation of the antitrust laws. The

17

Genting Defendants also join in this motion.  Upon review, the Court finds that Plaintiffs have adequately alleged an antitrust injury; however, they have failed to properly plead a relevant market in accordance with Sections 1 and 2 of the Sherman Act.  Accordingly, their antitrust claims are DISMISSED. [7]

1. <u>Section 1 of the Sherman Act</u>

Section 1 of the Sherman Act makes it illegal to enter into a "contract, combination . . . or conspiracy" to restrain trade or commerce.  15 U.S.C. § 1.  "To establish a [Section] 1 violation, a plaintiff must produce evidence sufficient to show:  (1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either *per se* or under the rule of reason." *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 95-96 (2d Cir. 1998).

i. *Per Se Analysis*

Plaintiffs claim that Defendants committed *per se* violations of Section 1 by engaging in "a group boycott" and a "refusal to deal."  Am. Compl. ¶ 167.  Further, at Oral Argument, Plaintiffs reiterated their belief that the Section 1 claim was a *per se* violation because Defendants were competitors who engaged in a horizontal agreement to refuse to deal with Plaintiffs.  Tr. 115:2-11.  Plaintiffs assertion that Defendants' conduct constitutes a *per se* violation is "a legal conclusion that the Court does not accept as true on a motion to dismiss." *Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 290 (S.D.N.Y. 2010).  Thus, as a threshold question, the Court must determine whether the Amended Complaint

---

[7] Since the Court may dismiss the Amended Complaint on the basis of Plaintiffs' failure to allege a relevant market, it will not address whether Plaintiffs have adequately alleged conduct in violation of the antitrust laws. *Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 299 (S.D.N.Y. 2010) (dismissing Section 1 case based on failure to allege a relevant product market and an antitrust injury, since "each independently is grounds to dismiss the complaint under the rule of reason," and declining to address defendant's argument that the conduct alleged was inadequate to state an antitrust violation).

adequately alleges a *per se* violation of the Sherman Act.

As the language of Section 1 "is broad enough to render illegal nearly all commercial understandings, the Supreme Court established a *rule of reason* analysis to guide courts in determining what is proscribed commercial activity." *Intellective, Inc. v. Massachusetts Mut. Life Ins. Co.*, 190 F. Supp. 2d 600, 615 (S.D.N.Y. 2002) (quoting *Smith v. Pro Football, Inc.*, 593 F.2d 1173, 1178 (D.C. Cir. 1978)) (internal quotation marks omitted and italics added). "Under the rule of reason analysis, the fact-finder determines whether a practice imposes an unreasonable restraint on competition by examining and weighing all the facts and circumstances of the case." *Id*. In an effort to avoid this fact-intensive process in cases demonstrating an obviously unreasonable restraint of trade or commerce, courts have identified certain types of agreements to be illegal *per se*. *Id.* at 616. In order for conduct to be a *per se* violation, it must be "so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that [it is] 'conclusively presumed illegal without further examination.' " *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993) (quoting *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 8 (1979)). The Supreme Court has explained that "[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607-08 (1972) (italics added). Accordingly, "the *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor . . . ." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 458 (1986) (italics added). Examples of *per se* violations include horizontal and vertical price-fixing, agreements between competitors at the

same level of the market structure to allocate territories, certain tying arrangements, and some group boycotts involving concerted refusals to deal with a competitor. *Capital Imaging,* 996 F.2d at 542–43; *Integrated Sys. & Power, Inc.,* 713 F. Supp. 2d at 291.

Plaintiffs claim that Defendants engaged in a group boycott and a concerted refusal to deal, both of which are considered to be *per se* violations, and which would relieve them from the requirement of demonstrating market-wide anticompetitive effect. *See* Pls.' Opp. Mem. to Empire and Entertainment Properties ("Pls.' Opp. Mem. to Empire") 16 n.6, Doc. 49. Although Plaintiffs allege that Defendants engaged in both a "group boycott" and a "refusal to deal," the two are "analytically identical." *Intellective, Inc.,* 190 F. Supp. 2d at 616. A group boycott is traditionally defined as a concerted effort by a group of competitors at a certain level to protect themselves from competition from a non-group member who seeks to compete at the same level. *Id.; Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC,* 317 F. Supp. 2d 301, 318 (S.D.N.Y. 2003) (a group boycott "is an agreement to pressure a supplier or customer not to deal with another competitor," citing *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 294 (1985)). Members of a group boycott usually protect themselves from outside competition by depriving the would-be competitor from something necessary to enter or survive the market in question. *Intellective, Inc.,* 190 F. Supp. 2d at 616.

Plaintiffs argue that "Defendants' concerted refusal to deal is a horizontal boycott agreement among competitors – the Empire Defendants (Monticello Raceway) and the Genting Defendants (Resorts World Casino) . . . – that directly decreases output and stifles competition, meriting *per se* analysis." Pls.' Opp. Mem. to Empire 16 n.6. As discussed in depth below, *infra* Section II(C), Plaintiffs fail to identify any illegal conduct undertaken by either Kien Huat Realty

or Genting NY, and accordingly, there can be no actionable horizontal agreement between the Empire Defendants and the Genting Defendants.  Plaintiffs also do not establish an agreement to engage in a group boycott between the Empire Defendants and EPT.  EPT is not in the casino business and therefore does not "compete" with Empire.  Plaintiffs at Oral Argument did not argue otherwise.  Tr. 62:18-24, 130:8-14.  Therefore, an agreement between EPT and Empire cannot constitute a horizontal agreement among competitors, and cannot be considered a group boycott.  *See generally Solent Freight Servs., Ltd. Inc. v. Alberty*, 914 F. Supp. 2d 312, 320 (E.D.N.Y. 2012) (dismissing *per se* claim against non-competitor defendants); *Team Obsolete Ltd. v. A.H.R.M.A. Ltd.*, 216 F.R.D. 29, 38 (E.D.N.Y. 2003) (same).  Accordingly, Plaintiffs' allegations are not subject to the *per se* rule.

      ii.    *Rule of Reason Analysis*

      The inapplicability of a *per se* analysis is not dispositive of Defendants' motion.  The conduct alleged in the Amended Complaint would constitute a violation of Section 1 if that conduct "imposes an unreasonable restraint on competition," i.e., if Defendants' conduct constitutes a violation under the rule of reason.  *Integrated Sys. & Power, Inc.* 713 F. Supp. 2d at 298 (citation omitted).  Defendants argue that the Amended Complaint fails to adequately allege a Section 1 violation under the rule of reason because, *inter alia*:  (1) it does not allege a legally cognizable antitrust injury and (2) it does not allege a relevant product market.

      a.  <u>Antitrust Injury</u>

      Under the rule of reason, in order to prove a Section 1 violation, a plaintiff must demonstrate an adverse effect on competition, not merely injury to itself.  Specifically, a plaintiff seeking recovery under Section 1 must allege that it has suffered "injury of the type the antitrust

laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 180 (S.D.N.Y. 2006) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)) (internal quotation marks omitted). This requirement stems from the notion that the antitrust laws were enacted to safeguard competition, and not competitors. *Brunswick Corp.*, 429 U.S. at 488. A plaintiff can recover under the antitrust laws only if defendants' conduct has a "competition-reducing" effect. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 343-44 (1990). The "adverse effect on competition is a requirement that must be alleged at the pleading stage and can be the basis for a motion to dismiss." *Integrated Sys. & Power, Inc.*, 713 F. Supp. 2d at 299.

To establish an antitrust injury, "a plaintiff must plead specific facts showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market, not just on plaintiff as a competitor." *Doron Precision Sys., Inc.*, 423 F. Supp. 2d at 180 (quoting *Capital Imaging Assocs., P.C.*, 996 F.2d at 543)) (internal quotation marks omitted). "A plaintiff asserts harm to competition by alleging adverse effects on the price, quality, or output of the relevant good or service." *New York Medscan LLC*, 430 F. Supp. 2d at 146; *Kasada, Inc.*, 2004 WL 2903776, at *11 (finding adequate pleading of antitrust injury when plaintiffs alleged that defendants' actions harmed consumers as a result of higher prices and a reduction of their ability to choose among differing levels of quality).

Plaintiffs' argument is premised on Defendants' alleged intent to monopolize the Catskills Racing/Gaming Market. The Amended Complaint alleges:

- Empire's local monopoly has been maintained and Genting NY's market share at Resorts World Casino has been insulated from competition;

- Plaintiffs have been foreclosed from competing with Empire or the

Empire/Entertainment Properties joint venture in any way, "reducing options for consumers of racing, gaming and related tourism products and services" in the Catskills region or competing with Genting NY within the New York Metropolitan Statistical Area and preventing the expansion of employment at the racino and other amenities that would be developed around Plaintiffs' proposed racino;

- Consumers of such products and services "pay and will continue to pay higher prices and receive service and amenities inferior to those they could receive at the New Concord Casino Resort, or be deprived of similar benefits that [Defendants] Empire and Genting [NY] would be compelled by such competition to offer at the Monticello Casino or Resorts World Casino . . . .;"

- Track, casino and hotel workers and vendors, and horse racing professionals will be detrimentally impacted by the lack of competition.

Am. Compl. ¶ 165.

The Amended Complaint further alleges that Defendants' exclusionary conduct has had the effect of increasing the prices paid by "local consumers, including Catskill region tourists, horsemen and other suppliers of racing and gaming products and services," for "transportation, lodging, parking, goods, gaming play incentives, paddock facilities, barn rents and race purses." *Id.* ¶¶ 133, 137, 165. Additionally, the Amended Complaint alleges that Defendants have caused a diminution in the quality, choice, and bargaining power for each of these products and services in the Catskills Gaming/Racing Market. *Id.* "Such injuries are the type the antitrust laws were designed to prevent." *New York Medscan LLC*, 430 F. Supp. 2d at 147 (finding that plaintiffs had sufficiently alleged an antitrust injury when the complaint alleged that defendants' illegal conduct harmed plaintiffs' business and decreased the price, quality and output of diagnostic imaging services). Accordingly, Plaintiffs have alleged an injury to competition sufficient to

withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on their Section 1 claim.[8]

b.   Relevant Market

Under the rule of reason, in order to prove a Section 1 violation, a plaintiff must also

allege a relevant market. *Integrated Sys. & Power, Inc.*, 713 F. Supp. 2d at 298.  In an antitrust

action, the relevant market is the "'area of effective competition' within which the defendant

operates." *AD/SAT, Div. of Skylight, Inc. v. Associated Press,* 181 F.3d 216, 227 (2d Cir. 1999)

(quoting *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327–28 (1961)).  Stated

differently, "[t]he goal in defining the relevant market is to identify market participants and

competitive pressures that restrain an individual firm's ability to raise prices or restrict output."

*Geneva Pharma. Tech. Corp. v. Barr Laboratories, Inc.,* 386 F.3d 485, 485 (2d Cir. 2004).  The

Second Circuit has explained that a

> 'market' is any grouping of sales whose sellers, if unified by a hypothetical cartel
> or merger, *could profitably raise prices* significantly above the competitive level.
> If the sales of other producers substantially constrain the price-increasing ability
> of the hypothetical cartel, these others are part of the market.

*AD/SAT,* 181 F.3d at 228 (emphasis in original) (citation and internal quotation marks omitted).

The concept of a relevant market has two components:  a product market and a geographic

market in which trade is unreasonably restrained or monopolized.  *Bayer Schering Pharma AG v.*

*Sandoz, Inc.,* 813 F. Supp. 2d 569, 574 (S.D.N.Y. 2011) (citations omitted); *Integrated Sys. &*

*Power, Inc.,* 713 F. Supp. 2d at 298.  Analyzed together, the product and geographic components

instruct the relevant market analysis, "which is essential for assessing the potential harm to

competition from defendants' alleged misconduct.  Therefore, courts have held that without a

---

[8] When questioned about the allegations of harm to consumers at Oral Argument, Defendants merely responded that "if" there was a sufficient allegation of harm, Plaintiffs would then need to allege a relevant market and market power.  Tr. 32:13-25 – 33:1-11.

proper delineation of both the product and geographic markets, a claim under [Section] 1, or [Section] 2, of the Sherman Act will be dismissed." *Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 481 (S.D.N.Y. 2001); *id.* ("[I]n order to survive dismissal, a plaintiff asserting claims under [Sections] 1 and 2 of the Sherman Act 'must allege a relevant geographic and product market in which trade was unreasonably restrained or monopolized,'" citing *Discon Inc. v. NYNEX Corp.*, 86 F. Supp. 2d 154, 160 (W.D.N.Y. 2000) (citation and internal quotation marks omitted)).

Plaintiffs allege that the proposed New Concord Casino Resort would compete with Monticello Casino for horsemen, gamblers and gaming products and services in the tourism destination area known as the Catskills region of New York, located within Sullivan, Delaware, Greene and Ulster counties ("Catskills Racing/Gaming Market"). Am. Compl. ¶ 146.[9] The Catskills region has a long history as a tourism and vacation destination, with natural resources for water sports, mountain sports, hunting and golf. In addition to the millions of day-time visitors to the Catskills, the region also attracts overnight visitors. *Id.* ¶ 154.

At Oral Argument, Plaintiffs explained that the New Concord Casino Resort would attract visitors from a "catchment area" consisting of a 100-mile radius from the Town of Thompson, Sullivan County, where the Concord Site is located. *See* Tr. 99:21-25 – 101:1-7. The catchment area encompasses 23 counties in New York, Northeastern New Jersey and Pennsylvania and has a total population of more than 18-20 million people, of which almost 90% reside in the New York, New York metropolitan area. The Plaintiffs refer to this catchment area

---

[9] In the Amended Complaint, Plaintiffs mention two potential additional markets, a "Casino Gaming Market" and a "Casino Resort Tourism Market." Am. Compl. ¶¶ 143-44. However, in their opposition papers, Plaintiffs clarified that "[t]he relevant market is the Racing/Gaming Market in the Catskills region." Pls.' Opp. Mem. to Empire 16 n.6. Moreover, at Oral Argument, Plaintiffs reiterated that there was only one relevant market, the Catskills Racing/Gaming Market which draws tourists from a 100-mile radius from the Town of Thompson. Tr. 99:21-25 – 101:1-7.

as the NY Metropolitan Statistical Area (the "NY MSA").  Am. Compl. ¶ 147.  The New

Concord Casino Resort would compete for gamblers and vacation tourists with the Resorts

World Casino in Jamaica, New York, the Monticello Casino, and other casinos/racinos, race

tracks and casino resorts that draw patrons from the NY MSA.  *Id.* ¶¶ 148, 150.  Accordingly,

Plaintiffs' relevant market consists of the Catskills Racing/Gaming Market with a 100-mile

catchment area from Thompson, New York.  *See* Tr. 99:21-25 – 101:1-7.[10]

     There are five casinos within a 100-mile radius of Plaintiffs' proposed New Concord

Casino Resort, including casinos located in New York and Northeastern Pennsylvania.  While all

of these casinos have slot machines, none offers a fully integrated casino-hotel/resort experience.

*Id.* ¶ 149.  Plaintiffs' New Concord Casino Resort would cater to both daytime visitors and

traditional overnight tourists, who Plaintiffs allege comprise Monticello Casino's current

consumer base, and to new overnight visitors from within a 100 mile radius who would visit and

stay at or near the New Concord Casino Resort as a gaming and resort destination.  *Id.* ¶ 157.

     Defendants argue that Plaintiffs have not adequately pled either a product or geographic

market.  The Court agrees.

### i.  *Product Market*

     "The product market inquiry focuses on the range of products that actually compete in the

disputed market," *Mathias,* 152 F. Supp. 2d at 480–81, and principally, this requires an "analysis

of the interchangeability of use or the cross-elasticity of demand" of the relevant products.

*Navarra v. Marlborough Gallery, Inc.*, 820 F. Supp. 2d 477, 486 (S.D.N.Y. 2011) (quoting

*Chapman v. N.Y.S. Div. for Youth,* 546 F.3d 230, 237 (2d Cir. 2008)) (internal quotation marks

---

[10] Plaintiffs argue that they do not have to define a market on their Section 1 claim because they are alleging a *per se* violation. Tr. 99:21-25 – 101:1-7. However, as the Court has already ruled that Plaintiffs' claims do not set forth a *per se* violation, Plaintiffs are indeed required to plead a relevant market.

omitted); *see also Geneva Pharm. Tech. Corp.*, 386 F.3d at 496 ("The relevant market is defined as all products 'reasonably interchangeable by consumers for the same purposes,' because the ability of consumers to switch to a substitute restrains a firm's ability to raise prices above the competitive level," quoting *U. S. v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)); *Intellective, Inc.*, 190 F. Supp. 2d at 610 ("Every product that can be substituted for the same use or purpose should be included within a single product market.").

"Interchangeability of use exists where one product is roughly equivalent to another for the use to which it is put." *Navarra*, 820 F. Supp. 2d at 486 (quoting *Chapman*, 546 F.3d at 238) (internal quotation marks omitted). "Products will be considered to be reasonably interchangeable if consumers treat them as 'acceptable substitutes.' " *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 46 (D.D.C. 1998) ("[T]he relevant market consists of all of the products that the Defendants' customers view as substitutes to those supplied by the Defendants.")). Cross-elasticity of demand exists "if consumers would respond to a slight increase in the price of one product by switching to another product." *Navarra*, 820 F. Supp. 2d at 486 (quoting *AD/SAT*, 181 F.3d at 227) (internal quotation marks omitted); *Intellective, Inc.*, 190 F. Supp. 2d at 610 ("'Cross-elasticity' is related to interchangeability, and requires a consideration of the extent to which a change in the price of one product will alter demand for another product.").

"To survive a motion to dismiss, an alleged product market must (1) include all products reasonably interchangeable, determination of which requires consideration of cross-elasticity of demand," *Intellective, Inc.*, 190 F. Supp. 2d at 609 (quoting *Re-Alco Industries, Inc. v. National Center for Health Education, Inc.*, 812 F. Supp. 387, 391 (S.D.N.Y. 1993)) (internal citation

marks omitted); "and (2) be plausible." *Id.* (citing *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 86 (2d Cir. 2000), abrogated on other grounds by *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)); *see also id.* (citing *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001)). The requirement of a relevant product market is meant to ensure that a plaintiff "has not been overly restrictive in his or her allegations of the relevant market in order to create an unwarranted 'appearance' of antitrust injury." *Intellective, Inc.*, 190 F. Supp. 2d at 609 (citation omitted). If a plaintiff alleges a relevant market "that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Linzer Products Corp. v. Sekar*, 499 F. Supp. 2d 540, 554 (S.D.N.Y. 2007) (citation and internal quotation marks omitted); *Navarra*, 820 F. Supp. 2d at 486 (citing *Chapman*, 546 F.3d at 238) (same); *Re-Alco Industries*, 812 F. Supp. at 391 (same). Further, a motion to dismiss may be granted if the proposed market makes "no rational or economic sense and is far too narrow." *McCagg v. Marquis Jet Partners, Inc.*, 05 Civ. 10607 (PAC), 2007 WL 2454192, at *6 (S.D.N.Y. Mar. 29, 2007). The Court notes that "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Smugglers Notch Homeowners' Ass'n, Inc. v. Smugglers' Notch Mgmt. Co., Ltd.*, 414 F. App'x 372, 375 (2d Cir. 2011) (quoting *Todd*, 275 F.3d at 199-200) (internal quotation marks omitted). "There is, however, no absolute rule against the dismissal of antitrust claims for failure to allege a relevant product market." *Id.* (quoting *Todd*, 275 F.3d at 200) (internal quotation marks omitted).

ii.   *Geographic Market*

The geographic market analysis attempts to identify the "precise geographic boundaries

of effective competition in order to reach a more informed conclusion on potential harm to the market." *Mathias*, 152 F. Supp. 2d at 481. "Courts generally measure a market's geographic scope, the 'area of effective competition,' by determining the area in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product." *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006) (quoting *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)). "Factors relevant to the geographic scope of a market may include barriers to transactions between buyers and sellers of different locations, such as transportation costs to a particular location or start-up costs in that location, as well as the relative preferences of consumers with respect to travel and price." *Id.* at 228 (citation omitted).

### iii. *Analysis*

The relevant market alleged in the Amended Complaint—the Racing/Gaming Market in the Catskills region which draws tourists from a 100-mile radius from the Town of Thompson—is too narrow and inherently implausible. At the outset, the Amended Complaint places the Town of Thompson at the epicenter of the New York Metropolitan Statistical Area, as that area is defined by the U.S. Office of Management and Budget. Am. Compl. ¶ 147.[11] The NY MSA extends into New Jersey, Connecticut and Pennsylvania and is the number one population base in the United States with a total population of 18-20 million people. *Id.* ¶¶ 147, 161. Plaintiffs assert that 90% of their target population resides in the NY MSA and that it is from that

---

[11] "The New Concord Casino Resort's "catchment area" (an economic term referring to the county where the casino property is located along with the surrounding areas in which it generates the most concentrated economic activity) would be the area within a radius of approximately 100 miles from the Town of Thompson . . . that catchment area is known as the New York-Northeastern New Jersey-Long Island, NY-NJ-PA Metropolitan Statistical Area . . . a 23 county area classified by the U.S. Office of Management and Budget as part of the 2010 U.S. Census." Am. Compl. ¶ 147.

population that they anticipate drawing the millions of "day-trippers" and "overnight visitors"

who visit the Catskills region. *Id.* ¶¶ 147, 154.

By confining the geographic market as they do, and making the Catskills the center of

gravity of the catchment area, Plaintiffs are able to compare themselves favorably to the casino

resorts in Connecticut[12] and Atlantic City[13] without having to account for those facilities as

competitors for antitrust purposes because they have defined them out of the relevant market,

i.e., the Connecticut and Atlantic City resorts are more than 100 miles outside the catchment

area. However, the Amended Complaint fails to mention that the Town of Thompson is nowhere

to be found within the NY MSA. *See* Industry/Local Business Statistics, New York-Northern

New Jersey-Long Island, NY-NJ-PA Metro Area,

http://www.census.gov/econ/census/snapshots_center/ny.html (last visited September 17, 2013).

This is significant to the analysis of the proposed relevant market because by Plaintiffs own

reckoning, the New Concord Casino Resort would compete with other racinos and casino resorts

that "draw patrons from the NY MSA," and are otherwise "reasonably accessible." *Id.* ¶¶ 143-

144, 148.

For those individuals that actually live in the NY MSA, otherwise known as the New

York metropolitan area, Plaintiffs provide no reason, much less a plausible one, why they could

*only* choose to go to the Catskills if they desired to take a day or overnight trip to a reasonably

accessible casino resort. As noted above, Plaintiffs acknowledge that the resorts in Atlantic City

---

[12] "The nearest resort casinos that offer entertainment and dining facilities that are comparable to those planned for the New Concord Casino Resort are . . . Foxwoods and Mohegan Sun in Connecticut[.]" Am. Compl. ¶ 132

[13] "Plaintiffs' New Concord Casino Resort would cater to both "day-trippers" residing in or close to the Catskills region and the traditional overnight tourists who currently account for 3.5 million visits annually to the Catskills region, who comprise Monticello Casino's current consumer base, and to new overnight visitors principally from within an approximately 100 mile radius who would visit and stay at or near the New Concord Casino Resort as a gaming and resort vacation destination, like the resort casinos in . . . Atlantic City." Am. Compl. ¶ 157.

and Connecticut provide amenities comparable to those in their proposed resort.  Those locations are also reasonably accessible to the New York metropolitan area by car.  As Plaintiffs themselves point out, the Connecticut resorts are only 125 miles outside of New York City.  Am. Compl. ¶ 132.  Atlantic City is likewise approximately 125 miles from New York City.  *See* Atlantic City Press Room, http://www.atlanticcitynj.com/mediaonline/fact_sheets_detail.aspx?factSheetID=16 (last visited September 17, 2013).  However, by defining the outer contours of the relevant geographic market as they do, and then placing the Town of Thompson at the center of that market, Plaintiffs essentially absolve themselves of the obligation to explain why 90% of their target population would not consider the Connecticut and Atlantic City resorts to be reasonable alternatives.  This they cannot do.  *Heerwagen*, 435 F.3d at 227 ("Courts generally measure a market's geographic scope, the 'area of effective competition,' by determining the area in which the seller operates and where consumers can turn, as a practical matter, for supply of the relevant product.") (citation omitted).

Moreover, by arbitrarily excising those alternative options and essentially arguing that there are no comparable competitors, Plaintiffs exempt themselves from the requirement of defining the market according to the rules of interchangeability and cross-elasticity.  *McCagg*, 2007 WL 2454192 at *5 (antitrust plaintiffs are required to define the market according to the rules of "interchangeability" and "cross-elasticity"); *see also Geneva Pharma. Tech. Corp.* 386 F.3d at 485 ("The goal in defining the relevant market is to identify market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output"); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162, 171-72

(S.D.N.Y.1995) ("Because a relevant market includes all products which are reasonably interchangeable, . . . [Plaintiffs'] failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal."). Nor do Plaintiffs offer a rational explanation for the failure to include those facilities. *See, e.g., B.V. Optische Industrie De Oude Delft*, 909 F. Supp. at 171 (failure of an antitrust plaintiff to set out a theoretically rational explanation to support its proposed relevant product market and to allege a plausible market will result in dismissal).

Simply stated, the Amended Complaint fails to adequately explain why "18-20 million people . . . would consider casinos within a 100 mile radius of Thompson (as opposed to New York City) to be their only reasonable choices." *See* Empire Defs.' Mem. at 16. In particular, "the Amended Complaint alleges no plausible fact explaining why other areas within convenient transit of the population center from which the New Concord Casino draws," such Atlantic City, New Jersey, the Poconos in Pennsylvania, or the casino resorts in Connecticut, should be excluded. *Id.*

In defense of their theory, Plaintiffs argue only that their proposed product market is unique and assert that the Amended Complaint alleges "various unique features from which non-interchangeability can be reasonably inferred."[14] Pls.' Opp. Mem. to Empire 16 (citing Am. Compl. ¶¶ 8, 131-32, 153-57). Plaintiffs specifically note that (1) the Monticello Casino is the only harness track and racino in the Catskills and the nearest racino is more than 80 miles away in Pennsylvania, Am. Compl. ¶ 131; (2) the nearest resort casinos that offer entertainment and dining facilities that are comparable to those planned for the New Concord Casino Resort are more than 150 miles away at Foxwoods and Mohegan Sun in Connecticut, *id.* ¶ 132; and (3) the

---

[14] The Amended Complaint does not explicitly assert that the proposed New Concord Casino Resort is "unique."

Catskills has traditionally been a tourism and resort destination, *id.* ¶ 152, 154-56. *See also* Pls.'
Opp. Mem. to Empire 17.

Plaintiffs also appear to argue that they need not show interchangeability in any event
because casino hotels are inherently unique: "Casino hotels are unique properties for purposes of
evaluating their risks and benefits to competition, as the Department of Justice has recognized in
Hart-Scott-Rodino regulations governing mergers under federal antitrust law. *See, e.g.,* 16
C.F.R. § 802.2(e)." *Id.* ¶ 145. It is important to note that the regulation cited was promulgated
by the Federal Trade Commission, not the Justice Department, and that it simply requires
gambling casino acquisitions to be reported under the Hart-Scott-Rodino Act when certain other
real estate acquisitions are exempt. It does not discuss how a relevant market should be defined
in the context of a casino hotel. *See* 16 C.F.R. § 802.2(e)(2).

To the extent that Plaintiffs' description of the Catskills can be read to assert a unique
geographic market, the Court rejects this argument. Plaintiffs claim that the Catskills is a tourist
destination with "popular natural resources for water sports, mountain sports, hunting and golf."
Am. Compl. ¶ 154. However, "[m]erely asserting that a commodity is in some way unique is
insufficient to plead a relevant market. Rather, an antitrust complaint must explain why the
market it alleges is the relevant, economically significant product market." *B.V. Optische
Industrie De Oude Delft,* 909 F. Supp. at 171 (rejecting a Section 2 claim where plaintiff alleged
that "chest equalization radiography" was the relevant market because plaintiff had not addressed
"any reasonably interchangeable alternatives")); *see also Conte v. Newsday, Inc.,* 703 F. Supp.
2d 126, 142–43 (E.D.N.Y. 2010) (dismissing complaint where plaintiff made "no effort to
explain the alleged market with reference to the interchangeability of the product at issue");

*Hack,* 237 F.3d at 86-87 (dismissing tying claim alleging that Yale, because of its uniqueness, constituted its own market for education, because many institutions provide "superb educational opportunities.").

The case of *Smugglers Notch Homeowners' Association, Inc. v. Smugglers' Notch Management Company, Ltd.*, 08 Civ. 186, 2009 WL 1545829 (D. Vt. May 29, 2009), *aff'd*, 414 F. App'x 372 (2d Cir. 2011), is particularly instructive on Plaintiff's implied uniqueness argument. In *Smugglers Notch*, one of plaintiffs' proposed geographic markets was a specific town in Vermont whose purported unique geographic qualities limited substitutability between it and properties at other ski areas. 2009 WL 1545829, at *3. In rejecting plaintiff's definition of the relevant market, the court noted that "Vermont boasts many ski areas, most with vacation properties available for rent or sale. Plaintiffs have not demonstrated why the vacation properties and recreation facilities at Smugglers' Notch are different from the myriad other options at ski resorts in Vermont." *Id.* Similarly here, Plaintiffs have not demonstrated why their facilities at the New Concord Casino Resort are different from the other options that may be available to customers who wish to combine a gambling trip with a tourism experience. As Defendants point out, various locations around New York City could also be thought of as tourist destinations, where tourists could gamble and have access to natural resources and other related activities. *See* Empire Defs.' Reply Mem. 7, Doc. 54.

Plaintiffs have failed to show why the target population would not consider racetracks and casinos in the vicinity of the New York metropolitan area, which are as accessible to residents of the NY MSA as the Catskills, as substitutes for its proposed facilities.[15]

---

[15] In their opposition papers, Plaintiffs argue that a court in this district has accepted the "narrow" Atlantic City gaming market as a plausible market and cite to *Mirage Resorts, Inc. v. Trump*, 97 Civ. 6693 (DAB), 1998 WL

Accordingly, Plaintiffs' Section 1 claim is DISMISSED.

2. Section 2 of the Sherman Act

The Second and Third causes of action allege a conspiracy to monopolize and monopolization in the Catskills Racing/Gaming Market in violation of Section 2 of the Sherman Act. Am. Compl. ¶¶ 174-189. Section 2 makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations . . . ." 15 U.S.C. § 2. "While [Section] 1 of the Sherman Act forbids contracts or conspiracies in restraint of trade or commerce, [Section] 2 addresses the actions of single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize." *Spectrum Sports Inc., v. McQuillan,* 506 U.S. 447, 454 (1993).

To successfully plead a Section 2 claim of conspiracy to monopolize, a plaintiff "'must allege (1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize.'" *Discover Fin. Servs. v. Visa U.S.A. Inc.,* 598 F. Supp. 2d 394, 405 (S.D.N.Y. 2008) (quoting *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.,* 129 F.3d 240, 246 (2d Cir. 1997)) (internal quotation marks omitted). To state a claim of monopolization, a plaintiff must allege: "'(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *PepsiCo, Inc.,* 315 F.3d at 105 (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71 (1966)).

Monopoly power is the power to control prices or exclude competition in a given market.

---

898340 (S.D.N.Y. Dec. 22, 1998). Pls.' Opp. Mem. to Empire 17 n.7. However, in *Mirage,* the issue of a relevant market was not in dispute.

*Grinnell*, 384 U.S. at 571 (citation omitted).  It can be pled directly through allegations of control over prices or the exclusion of competition, or it may be inferred from a defendant's large share of the relevant market.  *Geneva Pharms. Tech. Corp.*, 386 F.3d at 500 (citing *Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 98 (2d Cir. 1998)).  A plaintiff pleading conspiracy to monopolize and monopolization generally must define the relevant market, because "'[w]ithout a definition of that market there is no way to measure the defendant's ability to lessen or destroy competition.'" *Spectrum Sports*, 506 U.S. at 455-56 (quoting *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965)) (discussing a claim for monopolization); *Bayer Schering Pharma AG*, 813 F. Supp. 2d at 578 (dismissing claims for monopolization and conspiracy to monopolize in violation of Section 2 and conspiracy in restraint of trade in violation of Section 1 for failure to allege a plausible product market); *Solent Freight Servs., Ltd. Inc.*, 914 F. Supp. 2d at 323 ("A monopoly claim, just as a rule of reason claim, must show harm to competition in the relevant market.").

As relevant to this cause of action, Plaintiffs allege that Empire's Monticello Casino in the Catskills is the "only game in town," and colorfully describe it as being able "to operate profitably despite running a run-down racino where more people line up to play Tic-Tac-Toe against 'Roxy' the chicken than patronize the track." *Id.* ¶ 134.  Plaintiffs are therefore able to assert that the Monticello Casino enjoys 100% monopoly power in the Catskills region.  Tr. 104:4-13.  While the Amended Complaint alleges that the Monticello Casino can provide an inferior product at inflated prices with impunity, those charges are not tested against an appropriately defined geographic market.  It is easy enough to identify a competitor as a 100% monopolist when one defines the relevant market—as Plaintiffs do here—as the place where the

competitor operates and nowhere else.[16]  For the reasons set forth above, however, Plaintiffs have failed to set forth a plausible explanation for defining the market as narrowly as they do.

As a result of the infirmity of the defined market, Plaintiffs do not attempt to explain why the casino resorts in Atlantic City and Connecticut do not "substantially constrain the price-increasing ability" of the Monticello Casino.  *See AD/SAT*, 181 F.3d at 228 ("If the sales of other producers substantially constrain the price-increasing ability of the hypothetical cartel, these others are part of the market.").  Because Plaintiffs were required to account for such competitors and failed to do so, the Section 2 claims are also DISMISSED.

## C. Genting Defendants' Motion to Dismiss the Amended Complaint

Even if the claims against Defendants Kien Huat Realty and Genting NY (the "Genting Defendants")[17] had not been dismissed for the reasons set forth above, dismissal would still be appropriate as to them because the Amended Complaint fails to properly allege the antitrust liability of any of these defendants.  By lumping Kien Huat Realty and the John Doe entities ("Kien Huat") and Genting NY together, Plaintiffs fail to connect each or any individual entity to the overarching conspiracy, or alternatively, satisfy the requirements for imputing another affiliated entity's liability to the Genting Defendants.

### 1.  Extrinsic Materials

The Court must first address the extrinsic materials submitted by Plaintiffs in opposition

---

[16] Relatedly, Plaintiffs allege that there are five casinos within the relevant market as they define it.  Am. Compl. ¶149.  However, they do not identify them and utterly fail to explain, in light of the presence of the other four casinos, how it is that it is Monticello could have a 100% monopoly.

[17] Although Kien Huat Realty and Genting NY do not file their motion on behalf of John Doe entities 1-5, they request that the Court dismiss the claims against John Doe entities 1-5 "to the extent they are affiliates" of Kien Huat Realty or Genting NY.  Genting Defs.' Mem. 13 n.9, Doc. 46.  However, for the sake of consistency and clarity, the Court will refer to Kien Huat Realty and Genting NY as the "Genting Defendants" in the following discussion, except where otherwise noted.

to Defendants' motion. In their opposition, Plaintiffs submit a declaration by Roy Taub, counsel for Plaintiffs, along with various exhibits. Doc. 51. Plaintiffs rely solely on the content of these extrinsic materials in addressing the merits of the Genting Defendants' arguments in the instant motion. *See* Pls.' Opp. Mem. to Genting 1-8. Plaintiffs, however, do not provide any legal authority for why it would be appropriate for the Court to consider these documents on the motion to dismiss.

Plaintiffs' exhibits consist mainly of email exchanges with Empire and Colin Au and a letter complaint by Empire's then-CEO, Joseph Bernstein, to the NYS Racing Board meant to demonstrate how Kien Huat Realty gained control of Empire, even over the wishes of Empire's management (Exhibits 1-19, 22). These documents are not incorporated by reference or otherwise integral to the Amended Complaint. "Plaintiff[] may no more amend the [complaint] through motion papers, than Defendants may supplement the record with documents not integral to the [complaint]." *Serdarevic v. Centex Homes, LLC*, 760 F. Supp. 2d 322, 330 (S.D.N.Y. 2010) (citing *Yarborough v. Queens Auto Mall, Inc.*, 08 Civ. 3179 (DLI) (ALC), 2010 WL 1223584, at *2 (E.D.N.Y. Mar. 23, 2010) ("Plaintiff may not amend his complaint through his motion papers.")). Thus, the Court declines to consider these exhibits in analyzing whether there are sufficient factual allegations in the Amended Complaint establishing that Genting NY and Kien Huat Realty participated in an antitrust violation.

Plaintiffs also attempt to introduce two disclosures by Empire to the U.S. Securities & Exchange Commission (Exhibits 20-21) which they argue create "more than a reasonable inference that the Genting Group's and Kien Huat [Realty]'s acquisition of Aqueduct removed a competitor for Empire, pursuant to a common affiliation or a conspiracy to exclude competition,

38

or both." Pls.' Opp. Mem. to Genting 11-12.  The Court may consider statements set forth in documents of which judicial notice may be taken, but again only where the plaintiff *relied on* the contents of the document in drafting the complaint, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002), and solely to establish the existence of the opinions or assertions contained therein, rather than for the truth of the matters asserted.  *Global Network Commc'ns, Inc.*, 458 F.3d at 157 (citing *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998)).  Here, even if the Court could theoretically take judicial notice of these documents as public records, the documents are not integral to the Amended Complaint, and Plaintiffs did not rely on the terms or effect of these documents in drafting the Amended Complaint.  *Global Network Communications, Inc.*, 458 F.3d at 156-67.

### 2. Analysis of Antitrust Claims

As previously discussed, *supra* note 5, while Plaintiffs in the Amended Complaint define "Kien Huat" to include Kien Huat Realty and the John Doe 1-5 entities, their use is inconsistent and confusing.  Specifically, in their opposition memorandum, Plaintiffs use "Kien Huat" to refer to Kien Huat Realty alone. Pls.' Opp. Mem. to Genting 1.  Accordingly, the Court interprets references to "Kien Huat" in Plaintiffs' opposition memorandum to refer to Kien Huat Realty alone, except where otherwise noted.  However, for the sake of clarity and consistency with the Amended Complaint, the Court's references to "Kien Huat" below refer to both Kien Huat Realty and the John Doe 1-5 entities.

The Amended Complaint alleges that although Kien Huat Realty and Genting NY have separate legal forms and principal places of business, Am. Compl. ¶¶ 36, 40, they have an affiliated relationship *inter se*.  Plaintiffs aver that Genting NY is a wholly-owned subsidiary of

non-defendant Genting Malaysia Berhad, a company which is in turn 49.3% owned by non-defendant Genting Berhad, a company in which non-defendant Kien Huat Realty Sdn Bhd owns a 39.6% stake. *Id.* ¶¶ 17-18, 37, 39. Plaintiffs plead that Kien Huat Realty and Genting NY share ownership or control in common over the Empire Defendants through "Kien Huat" and Colin Au. Plaintiffs specifically plead that Kien Huat and Au exercise "operating control" over both Empire and Genting NY, with Au "serving as the *de facto* chief executive of both companies." *Id.* ¶¶ 14, 18, 36, 88, 90 (italics added). The Amended Complaint refers to Kien Huat and Genting NY collectively as the "Genting Defendants." *Id.* p. 2. Plaintiffs have alleged that the Genting Defendants violated Sections 1 and 2 of the Sherman Act by engaging in conspiracies to preclude Plaintiffs from constructing the New Concord Casino Resort. *Id.* ¶¶ 166-183.

To survive a motion to dismiss, a complaint asserting conspiracy claims under Sections 1 and 2 "must contain enough factual matter (taken as true) to suggest that an agreement to engage in anticompetitive conduct was made," *In re Elevator Antitrust Litig.*, 502 F.3d at 50 (quoting *Twombly*, 550 U.S. at 556) (alterations and internal quotation marks omitted), and to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. This required factual content must be pleaded with respect to each defendant named in the complaint. *In re Elevator Antitrust Litig.*, 502 F.3d at 50-51 (a complaint that enumerates "basically every type of conspiratorial activity that one could imagine" and that lists "in entirely general terms without any specification of any particular activities by any particular defendant" is "nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever") (citation and internal quotation marks omitted);

40

*In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 689 (S.D.N.Y. 2012) ("[C]ourts must evaluate how each defendant conspired in violation of the antitrust laws," quoting *AD/SAT*, 181 F.3d at 234) (internal quotation marks omitted); *In re Processed Egg Products Antitrust Litig.*, 821 F. Supp. 2d 709, 721 (E.D. Pa. 2011) (12(b)(6) case requiring that Plaintiffs adequately allege particularized facts that each Defendant undertook certain acts, or engaged in certain conduct, that plausibly suggest that particular Defendant's purposeful participation in the overarching conspiracy); *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) ("A [Section] 1 complaint must adequately allege the plausible involvement of each defendant and put defendants on notice of the claims against them, but it need not be detailed with overt acts by each defendant.").

To provide reasonable notice to defendant of the claims against it, a complaint must plausibly suggest that the individual defendant "actually joined and participated in the conspiracy." *In re Processed Egg Products Antitrust Litig.*, 821 F. Supp. 2d at 719. The plaintiff must offer allegations in the complaint which plausibly suggest that the defendant agreed to the conspiracy. *Id.* Accordingly, the issue on a motion to dismiss the claims against an individual defendant is whether the pleading provides information "to some sufficiently specific degree" that a defendant "purposefully joined and participated in the conspiracy." *Id.* at 720.

Here, the Amended Complaint predominantly attributes conduct that ostensibly advanced the conspiracy to Kien Huat, which Plaintiffs allege operated as a "classic trust" in violation of competition. Pls.' Opp. Mem. to Genting 10. For example, Plaintiffs charge that Genting NY, controlled by Kien Huat, had a motive to eliminate potential competition by the New Concord Casino Resort; the new casino would compete with Genting NY's Resorts World Casino as it

41

would draw customers from the New York metropolitan area. *Id.*; Am. Compl. ¶ 23.  Plaintiffs

also allege that the New Concord Casino Resort would directly compete with the Monticello

Casino, also under the control of Kien Huat, in the Catskills Racing/Gaming Market. *See* Pls.'

Opp. Mem. to Genting 10.  However, even if Genting NY and Kien Huat possessed the

motivation Plaintiffs assert, this alone is insufficient to establish a conspiracy.  "The Court does

not believe that the various motives each individual defendant may or may not have had to be rid

of plaintiff gives rise to an inference that the defendants *conspired* to [injure] plaintiff in

violation of the antitrust laws." *AD/SAT, a Div. of Skylight, Inc. v. Associated Press*, 885 F.

Supp. 511, 520 (S.D.N.Y. 1995) (quoting *Caldwell v. American Basketball Ass'n*, 825 F. Supp.

558, 572 (S.D.N.Y.1993)) (alterations and internal quotation marks omitted) (emphasis in

original).  Further, as explained by the Supreme Court in *Twombly*, "resisting competition is

routine market conduct," and, if this were sufficient to state a claim, "pleading a [Section] 1

violation against almost any group of competing businesses would be a sure thing." *Twombly*,

550 U.S. at 566; *see also United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001)

("[I]n considering whether the monopolist's conduct on balance harms competition and is

therefore condemned as exclusionary for purposes of [Section] 2, our focus is upon the effect of

that conduct, not upon the intent behind it.  Evidence of the intent behind the conduct of a

monopolist is relevant only to the extent it helps us understand the likely effect of the

monopolist's conduct.").[18]

---

[18] With respect to the allegation that Genting NY lobbied the New York State legislature against the development of casinos within driving distance of the Resorts World Casino, Genting NY argues that Plaintiffs are not claiming that the lobbying was directed at the Concord site in particular, but rather against gaming facilities in general, Genting Defs.' Mem. 5, and that even if Plaintiffs had alleged that Genting NY lobbied against the development of the Concord site, its action is protected by the *Noerr-Pennington* doctrine, which precludes antitrust claims based on lobbying. *E.R.R. Presidents Conference. v. Noerr Motor Freight Inc.*, 365 U.S. 127 (1961) (finding no antitrust liability for petitioning government for favorable and potentially anticompetitive legislation); *see also Ottensmeyer*

Additionally, "[a]s in *Twombly,* where the Court found that the actions described in the complaint were 'doctrinally consistent with lawful conduct,'" Genting NY's submission of a bid for Aqueduct "is just as consistent with an alternative, lawful explanation of events"—that Genting NY simply wanted to pursue the Aqueduct business opportunity. *Navarra,* 820 F. Supp. 2d at 487 (citation omitted) (in alleged antitrust conspiracy involving an artist, the artist's attorney, and a competitor to artificially restrict competition in a market for the artist's ceramics, assertion that the competitor was behind the acts of other individuals was "too speculative and conclusory" to survive a motion to dismiss, and the competitor's relationship to the artist "is just as consistent with an alternative, lawful explanation of events"—that the artist was attracted to a new business opportunity). Also, as noted by the Genting Defendants, the Amended Complaint alleges that the conspiracy did not begin until 2011, almost two years *after* the meeting between Au and Capelli at Aqueduct and after Genting NY won the bid to operate a racino there. Genting Defs.' Reply Mem. 4 (citing Am. Compl. ¶ 19), Doc. 53.

Defendants also challenge Plaintiffs' allegation that the financing for Empire's development of the Concord Site "would *most likely* come from Empire's 'silent' third party, Genting NY, or Empire's and Genting NY's mutual parent, Kien Huat." Genting Defs.' Mem. 6 n.3 (citing Am. Compl. ¶ 117) (emphasis added). This allegation is speculative at best and cannot be the basis to establish Genting NY's or Kien Huat's involvement in the conspiracy. *Navarra,* 820 F. Supp. 2d at 487 ("There is no evidence beyond abject speculation that [the competitor] committed any wrongdoing. Such guesswork is insufficient to state a claim."); *see*

---

*v. Chesapeake & Potomac Tel. Co. of Md.,* 756 F.2d 986, 9993 (4th Cir. 1985) ("The policies behind the *Noerr–Pennington* doctrine include preserving an individual's first amendment right to petition government officials."). Plaintiffs in response do not actually address whether Genting NY's lobbying efforts fall within the *Noerr–Pennington* doctrine, *see* Pls.' Opp. Mem. to Genting 13 n.11, and, accordingly, abandon this argument.

*also In re Elevator Antitrust Litig.*, 502 F.3d at 50-51.[19]

The Amended Complaint predominately attributes conduct that advanced the conspiracy to various defendants grouped together under a single name, and seeks to impute liability collectively to those various defendants.  For example, Defendants Genting NY and Kien Huat are referred to as the "Genting Defendants," non-defendant Genting Berhad and its subsidiaries and affiliates, including Genting NY, are referred to as the "Genting Group," and Defendants Kien Huat Realty and John Doe entities 1-5 are collectively referred to as "Kien Huat."  Am. Compl. ¶ 17.

For example, with respect to the Genting Defendants, the Amended Complaint alleges:

- Starting in 2011, the Entertainment Properties Defendants entered into "agreements, combinations and conspiracies" with the Empire Defendants and the Genting Defendants to stop cooperating with Plaintiffs and to obstruct and delay Plaintiffs' efforts to complete development of the New Concord Casino Resort. *Id.* ¶¶ 19, 21-22, 25.

- To foreclose Plaintiffs' access to the Concord property, Empire and the Genting Defendants entered into agreements with Entertainment Properties and "paid" Entertainment Properties not to cooperate with Plaintiffs, and disavow or repudiate agreements with Plaintiffs. *Id.* ¶ 22.

- The Genting Defendants have publicly opposed any sort of new gaming competition to its Resorts World Casino and lobbied against New York providing gaming licenses anywhere within driving distance of the casino, whether in the form of a casino on Long Island, the Catskills or elsewhere. *Id.* ¶¶ 91, 141, 142.

As the foregoing demonstrates, Plaintiffs "have not directly alleged" that any of the

---

[19] In *In re Elevator Antitrust Litigation*, Plaintiffs asserted that defendants, in order to effect an antitrust conspiracy, participated in meetings in the United States and Europe to discuss pricing and market divisions, agreed to fix prices for elevators and services, rigged bids for sales and maintenance, exchanged price quotes, allocated markets for sales and maintenance, 'collusively' required customers to enter long-term maintenance contracts, and collectively took actions to drive independent repair companies out of business.  The Second Circuit explained that, "[a]s the district court observed, the complaint enumerates 'basically every type of conspiratorial activity that one could imagine . . . The list is in entirely general terms without any specification of any particular activities by any particular defendant[; it] is nothing more than a list of theoretical possibilities, which one could postulate without knowing any facts whatever.'" 502 F.3d at 50-51 (citations omitted and brackets in original).

Genting Defendants individually, as Kien Huat Realty or Genting NY, agreed to or participated

in the conspiracy to prevent Plaintiffs from constructing the Concord Resort Casino.  Group

pleading, by which allegations are made against families of affiliated entities is simply

insufficient to withstand review on a motion to dismiss.  *See Precision Associates, Inc. v.*

*Panalpina World Transp. (Holding) Ltd.*, 08 Civ. 00042 (JG) (VVP), 2012 WL 3307486, at *1

(E.D.N.Y. Aug. 13, 2012) ("The plaintiffs must allege facts . . . that nudge their claims against

each defendant across the line from conceivable to plausible, and the bare allegation that one

defendant is the subsidiary of another fails to satisfy that requirement"); *In re Digital Music*

*Antitrust Litig.*, 812 F. Supp. 2d 390, 417 (S.D.N.Y. 2011) (finding insufficient a complaint that

alleged direct involvement of the parent companies by way of generic references to

"defendants"); *In re Processed Egg Products Antitrust Litig.*, 821 F. Supp. 2d at 746-47

(declining to impute liability to a group of defendants on a 12(b)(6) motion where plaintiffs

engaged in group pleading of defendants since there were no factual allegations in the complaint

to connect each, or any, of the group defendants, directly to the conspiracy).

      Moreover, as discussed by the court in *In re Processed Egg Products Antitrust Litigation*:

> Conclusory, collective language is too convenient, too undisciplined, and too
> unfocused in light of exposures to litigation expense and disruption (even without
> ultimate liability) that are so great in antitrust (and other) cases.  Such exposure
> ought to be limited to those who have been made at least reasonably aware of
> what they have done or failed to do, lest the litigants be left to wander aimlessly
> through the wilds and wilderness of discovery to no ultimate destination.

821 F. Supp. 2d at 720.

      The case of *Invamed, Inc. v. Barr Laboratories, Inc.*, 22 F. Supp. 2d 210 (S.D.N.Y. 1998)

is particularly instructive on the issue of imputing liability on affiliated defendants through

chains of ownership linked to a competitor.  In *Invamed*, a manufacturer and marketer of

45

pharmaceuticals sued a supplier of warfarin sodium clathrate ("clathrate") which allegedly refused to deal with it, and affiliated parties, asserting antitrust injuries. The plaintiff claimed that through chains of ownership or control, the affiliated defendants exercised dominion and control over the supplier. 22 F. Supp. 2d at 214-15.

In the complaint, plaintiff merely alleged that certain of the affiliated defendants, through various entities, acquired control of the supplier of clathrate. *Id.* The affiliates subsequently filed for partial dismissal of the complaint, alleging that there were no allegations in the complaint to allege that the affiliates took part in the conduct that provided the basis for the claims. *Id.* at 216. Dismissing the claims against the affiliates, the court noted that plaintiff had failed to allege that there was concerted action between any of the defendants. In fact, the court found that the supplier's refusal to deal with plaintiff—the basis of plaintiff's claims—alleged nothing more than unilateral action by the supplier. *Id.* at 221. The court similarly dismissed claims against the affiliates for monopolization and attempted monopolization and noted that they "may not be held liable for [the supplier]'s refusal to supply clathrate to Invamed solely due to their corporate affiliation with [the supplier]." *Id.* at 119.

As in *Invamed*, the Plaintiffs here rely solely on alleged chains of ownership from Empire to Kien Huat and associated entities, including numerous foreign non-parties, and down again to Genting NY. Plaintiffs ask the Court to rely on the Northern District of California's decision in *In re Cathode Ray Tube (CRT) Antitrust Litigation*, 738 F. Supp. 2d 1011 (N.D. Cal. 2010), which held that courts in the Northern District of California do not require plaintiffs in complex, multinational, antitrust cases "to plead detailed, defendant-by-defendant allegations; they instead require plaintiffs 'to make allegations that plausibly suggest that each Defendant participated in

46

the conspiracy." 738 F. Supp. 2d at 1019 (citation and internal quotation marks omitted).

Relying on this case, Plaintiffs here argue that the allegations of Kien Huat Realty's control of the Empire and Genting defendants "mean[s] that when the [Entertainment Properties] Defendants conspired with Au and the Empire Defendants to exclude Plaintiffs from competing against them, the Genting Defendants were present and represented by Au and were parties to the agreements." Pls.' Opp. Mem. to Genting 13. Plaintiffs' reliance on *In re Cathode Ray Tube* is misplaced because, unlike the pleading here, both complaints in that case contained plausible allegations concerning the participation of specific defendants in unlawful meetings and agreements. In particular, the complaints detailed hundreds of meetings relating to the conspiracy that took place among the various defendants. Genting Defs.' Reply Mem. 3 n.4 (citing *In re Cathode Ray Tube (CRT) Antitrust Litigation*, 738 F. Supp. 2d at 1017-22).

Plaintiffs also attempt to impute liability to Genting NY through an allegation that in Defendant EPT's July 28, 2011 Second Quarter Earnings Conference Call, its President and Chief Executive Officer acknowledged that "Genting Group" was involved in the Exclusivity Agreement and the development plans for the Concord Site as the "silent third party behind" Empire. Am. Compl. ¶ 112. As previously discussed, Plaintiffs refer to Genting Berhad and its subsidiaries and affiliates as the "Genting Group." *Id.* ¶¶ 17, 38. Genting Berhad is a non-defendant and Plaintiffs have failed to indicate conduct specific to Genting NY in this allegation.

Finally, Defendants argue that the Amended Complaint seeks to impute Empire's alleged actions to Kien Huat Realty on the theory that Kien Huat Realty is the corporate parent of Empire and controlled both Empire and Genting NY. Genting Defs.' Mem. 6. However, the Amended Complaint fails to allege a basis to disregard the separate corporate forms of these

47

entities and to impose liability on Kien Huat Realty. "As a general matter and absent any allegations of piercing the corporate veil, a corporate relationship alone is not sufficient to bind a parent corporation for the actions of its subsidiary." *Arnold Chevrolet LLC v. Tribune Co.*, 418 F. Supp. 2d 172, 178 (E.D.N.Y. 2006) (quoting *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996)) (alteration and internal quotation marks omitted). "[I]n the antitrust context, courts have held that absent allegations of anticompetitive conduct by the parent, there is no basis for holding a parent liable for the alleged antitrust violation of its subsidiary." *Id.* ("[T]hat the Affiliates possess market power through their alleged ownership interests in [the supplier], standing alone, does not satisfy the pleading requirements of a monopolization or attempted monopolization claim," quoting *Invamed, Inc.*, 22 F. Supp. 2d at 219). Here, the only allegation of Kien Huat Realty's control over Empire is that Colin Au is the "*de facto* chief executive" of both Empire and Genting NY. Am. Compl. ¶¶ 14, 18, 36, 88, 90. Defendants correctly assert that even if Plaintiffs had pled that Au is the actual CEO of both Empire and Genting NY, it is a "well established principle of corporate law that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." Genting Defs.' Mem. 8 (quoting *United States v. Bestfoods*, 524 U.S. 51, 69 (1998)) (brackets, citation and internal quotation marks omitted); *see Fried v. LVI Servs., Inc.*, 10 Civ. 9308 (JSR), 2011 WL 2119748, at *5 (S.D.N.Y. May 23, 2011) (in the age discrimination context, the court granted a motion to dismiss because plaintiff plead "no facts to rebut the presumption that directors with affiliations to more than one corporation 'change hats' in order to fulfill their obligations to each entity.").

Plaintiffs in response assert that they are not required to pierce the corporate veil but

rather they are able to impute Empire's actions to Kien Huat Realty. Pls.' Opp. Mem. to Genting 14; Tr. 115:12-25. Further, by their reliance on *Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 112 (W.D.N.Y. 1997), Plaintiffs appear to suggest that the mere allegation of interlocking officers or directors suffices to create "a plausible inference of control for purposes of an antitrust conspiracy . . . at the pleading stage." Pls.' Opp. Mem. to Genting 14.[20]  However, this is contrary to "well established principle[s] of corporate law," *Bestfoods*, 524 U.S. at 69, and is a misreading of *Daniel*. In *Daniel*, the court concluded, without reference to interlocking officials, that the complaint properly identified conspiratorial acts by all defendants. *Daniel*, 988 F. Supp. at 124-25. Such is not the case here. *See* Genting Defs.' Reply Mem. 7 n.8. Accordingly, Plaintiffs' failure to allege the individual participation of each of the "Genting Defendants" provides an additional independent basis to dismiss the Amended Complaint against them.

### D. State Law Claims

The Court has jurisdiction over this case on the basis of Plaintiffs' federal questions of claims under the Sherman Act, 15 U.S.C. §§ 1 and 2. Having dismissed the federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction."). Accordingly, Plaintiffs' state law claims of tortious interference with contract and tortious interference with business relations are dismissed without

---

[20] Plaintiffs cite the following language in *Daniel*: "[M]any of the officers and directors of ABEM were at one time, or are presently, affiliated with other co-conspirator institutions, including the hospital Defendants, or organizations in the specialty of emergency medicine . . . These interrelationships further enable ABEM and Diplomats of ABEM to control and influence the specialty of emergency medicine throughout the United States and to perpetrate and perpetuate anticompetitive conduct through their alleged conspiracies . . . Accordingly, Plaintiffs have stated a claim for conspiracy to monopolize." 988 F. Supp. at 127.

prejudice to renewal in the proper state court.

**E. Leave to File A Second Amended Complaint**

At the pre-motion conference on September 14, 2012, the Court allowed Defendants to file motions to dismiss the Amended Complaint. The Court also instructed Plaintiffs that they could submit a letter to the Court if they wished to file a Second Amended Complaint. Defendants filed their moving papers on September 25, 2012, Plaintiffs filed their opposition papers on October 25, 2012, and Defendants filed their reply papers on November 8, 2012. Plaintiffs did not request leave to amend the Amended Complaint in their opposition papers. On November 29, 2012, Plaintiffs requested a pre-motion conference to seek leave to file a Second Amended Complaint. By letters dated December 4, 2012, Defendants opposed such request.

On May 8, 2013, the Court held Oral Argument on the instant motions and on Plaintiffs' request to file a Second Amended Complaint. At Oral Argument, Plaintiffs stated that they would wait for the Court's opinion on the instant motions and then assess whether they wished to file a Second Amended Complaint. Tr. 144-22-25 – 145:1-15. Accordingly, "Plaintiff[s] ha[ve] not moved for leave to amend [their] antitrust claims in the event that the [C]ourt finds them lacking, and ha[ve] already amended [their] Complaint once before. Thus, it is within the [C]ourt's discretion to dismiss Plaintiff[s'] claims without giving [them] leave to amend [their] complaint to cure the pleading defects." *Solent Freight Servs., Ltd. Inc.*, 914 F. Supp. 2d at 323 (citing *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1132 (2d Cir. 1994) ("[W]e do not deem it an abuse of the district court's discretion to order a case closed when leave to amend has not been sought.").

**III. Conclusion**

For the reasons stated above, Plaintiffs' antitrust claims are DISMISSED with prejudice. The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims and therefore DISMISSES those claims without prejudice.  The Clerk of the Court is respectfully directed to terminate the motions (Docs. 41, 44) and close this case.

It is SO ORDERED.

Dated: September 18, 2013
New York, New York

Edgardo Ramos, U.S.D.J.